## APPEAL OF ARTHUR B. GROVER.

Docket No. 1159.   Submitted May 6, 1925.   Decided January 30, 1926.

An agreement construed to be a contract of sale of land. The vendee had an equitable interest in the land and the contracts of sale arising therefrom, the value of which is to be taken into consideration in determining future gains or losses thereon.

*Robert H. Montgomery, J. Marvin Haynes,* and *Leland T. Atherton, Esqs.,* for the taxpayer.

*Laurence Graves, Esq.,* for the Commissioner.

Before MARQUETTE and MORRIS.

This appeal is from the determination of a deficiency of $6,097.27 in income tax for the years 1917 to 1920, inclusive, arising from adjustments made by the Commissioner increasing the amount computed to be the taxpayer's distributive share of the income of Grover and Layman, a partnership.

### FINDINGS OF FACT.

The taxpayer is an individual residing in the City of New York.

He is and was during the years 1909 to 1920, inclusive, a member of the partnership of Grover and Layman. The other members of the partnership were Charles A. Layman and Bedford P. Thiebaud. The partnership is and was, during the years mentioned herein, engaged in the business of buying real estate, improving and dividing it into lots, and selling them.

Some time in the year 1909, the partnership entered into negotiations with the Edgewood Improvement Association, of New Orleans, La., hereinafter called the Association, for the purchase of a certain tract of land, containing 1,462 lots, owned by the Association and located in the City of New Orleans, and offered to pay therefor $250,000, in annual installments of not less than $30,000 each, over a period of eight years, the deferred payments not to bear interest. The Association agreed to sell the lots in question to the partnership for $250,000, payable over a term of years, deferred payments not to bear interest, but was unwilling to convey to the partnership the legal title to the lots unless it would make a down payment of not less than one-fourth of the purchase price. As the partnership needed all its available resources to develop and market the lots in the event that it acquired them, it was unable at that time to make a substantial down payment and give a mortgage for the balance of the purchase price. It suggested to the Association that the Association accept annual payments on the purchase price of the lots and retain the legal title to the lots as security for the payment of the entire purchase price; that, in lieu of a down payment, the partnership would expend on the lots whatever amount of money would be required to develop and market them, and that the members of the partnership would market and sell the lots in the same manner as if they held the legal title thereto. The Association agreed to the terms suggested by the partnership and authorized its president to enter into a contract to sell the lots to the partnership for $250,000, and, on March 10, 1910, the partnership and the Associa-

tion, by its president, made and entered into a written contract of which the provisions material here are, in substance, as follows:

The Association constituted the partnership its agent to sell the real estate involved and granted to it the sole and exclusive right to sell the same for a period of eight years, and agreed that, during that time, it would not sell said real estate or any part thereof, or permit or suffer it to be sold, except through the partnership. The partnership was to offer the lots for sale and was to fix and determine the price at which they were to be sold, such selling price to be sufficiently large so that 90 per cent thereof would be equal to $250,000. The partnership agreed that, by the use of its own funds, it would stake and number the 1,462 lots contained in the tract of land and would use its own funds to advertise the sale of the lots, and that it would provide special trains for prospective purchasers on sales days, employ agents, and otherwise aggressively push the sale of the lots. The partnership also agreed to pay all city and State taxes for the years subsequent to the year 1911, to reimburse the Association for taxes to be paid by it for the years 1910 and 1911—subsequently determined to be the amount of $3,608.85—and to pay the Association each year 90 per cent of all collections from sales. If 90 per cent of the collections from sales in any one year should be less than $30,000, the partnership was to make good the deficit. The Association agreed that, upon the payment to it by the partnership of the amount of $250,000, plus taxes for the years 1910 to 1911, it would convey to the partnership all unsold lots and assign to it all amounts remaining uncollected on lots theretofore sold, and that thereupon the interests of the Association in the real estate and uncollected balances should cease and terminate. If in any year the partnership should fail to make the minimum payment of $30,000, it was to forfeit all rights under the contract. The payments, however, were always made.

The written instrument of March 10, 1910, although in form a contract creating the relation of principal and agent between the Association and the partnership, was intended by the parties thereto to be in fact a contract for the sale by the Association of the lots therein described for $253,608.85, payable in installments, the Association to retain the legal title to the lots until the entire amount of the purchase price should have been paid.

Pursuant to the contract of March 10, 1910, the partnership at its own expense improved and advertised the lots referred to at a cost of more than $7,500, and between March 10, 1910, and March 1, 1913, it sold 966 lots, the contract of sale in each case providing that, in the event of default in payment by the purchaser, the right of resale should revert to the partnership. A

few sales were also made outright. On these 966 contracts of sale and outright sales, there was collected prior to March 1, 1913, the amount of $122,281.80, of which amount 90 per cent, or $110,-053.61, was paid to the Association, leaving a balance of $143,555.24 due to the Association on March 1, 1913, under the contract of March 10, 1910.

On March 1, 1913, there were outstanding 966 contracts for the sale of lots, on which payments were being made and on which there was unpaid the amount of $258,870, and there were 481 lots of the 1,462 lots referred to unsold and not under contract to be sold. The value of the outstanding contracts of sale on March 1, 1913, was $225,977.13, and the fair market value of the unsold lots at that time was $197,008.48.

During the years 1910 to 1916, inclusive, the amount spent by the partnership in improving and selling the lots referred to exceeded the 10 per cent of the collections from sales, which it retained under the contract of March 10, 1910.

During the year 1917, the partnership completed the payment of the amount of $253,608.85, due by it to the Association under the contract entered into by them on March 10, 1910, and the Association on May 1, 1918, conveyed to the partnership all the lots then unsold and assigned to it the uncollected balances outstanding on the contracts theretofore made for the sale of the lots.

The partnership continued to sell lots and to make collections on contracts of sale during the years 1917 to 1920, inclusive. It made returns of income for those years, but the evidence does not disclose how it computed its profits arising from such sales and collections. The Commissioner, however, upon audit of the partnership returns, determined that the amounts collected by the partnership in those years, on the contracts of sale of the lots involved, represented compensation for services rendered by the partnership under the contract of March 10, 1910, and that they were income to the partnership when received. He adjusted the partnership income and the taxpayer's distributive share thereof accordingly.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 10 days' notice, under Rule 50.

### OPINION.

MORRIS: The solution of the question presented by this appeal depends upon the construction to be placed on the contract entered into on March 10, 1910, by and between the Edgewood Improvement Association and the partnership of Grover and Layman, outlined in

the findings of fact. The taxpayer contends that, regardless of the form of the written instrument, it was intended by the parties thereto to be a contract for the sale by the Association to the partnership of the lots therein described, and that the partnership had, on March 1, 1913, an interest in the unsold lots and outstanding contracts of sale, which should be taken into consideration in determining the partnership income for the years 1917 to 1920, inclusive, arising from the sale of the lots and the collections on the contracts. The taxpayer also urges that, even if the contract of March 10, 1910, be construed as merely creating the partnership the agent of the Association to sell the lots in question, the partnership acquired, in addition to the power to sell the lots, an interest therein and in all contracts of sale thereof, and that the interest so acquired had a value on March 1, 1913, which must be considered in computing the partnership income in subsequent years. The Commissioner contends that the contract of March 10, 1910, created the partnership the agent of the Association to perform certain services for which payment was to be made upon completion, and that the partnership did not on March 1, 1913, have any interest in the lots and sales contracts involved herein.

Even if the Commissioner's construction of the contract of March 10, 1910, be correct, which, for the reasons hereinafter set forth we do not think is the case, his determination of the partnership income for the years 1917 to 1920, inclusive, is, nevertheless, incorrect. The services rendered by the partnership were completed in the year 1917, and the unsold lots and outstanding contracts of sale were conveyed to it by the Association in the year 1918. Therefore, if the contract was only for services to be performed by the partnership and to be paid for on completion, it follows that the compensation for such services was income to the partnership in the year 1917 or the year 1918, depending on whether it kept its books on the cash receipts and disbursements basis or the accrual basis. If its books were kept on the accrual basis, the unsold lots and outstanding contracts of sale were income to the partnership in the year 1917, to the extent of their fair market value at the time the partnership completed the services under the contract of March 10, 1910. If the partnership's books were kept on the cash receipts and disbursements basis, the partnership received income in the year 1918, to the extent of the fair market value of the unsold lots and outstanding contracts of sale, at the time they were conveyed or assigned to it by the Association.

The evidence in this appeal establishes that the partnership agreed to purchase and the Association agreed to sell to it certain lots for $253,608.85, payable over a term of years. The Association was,

however, unwilling to convey the legal title to the lots unless it received a substantial initial payment, which the partnership was unable to make at that time. The partnership therefore suggested to the officers of the Association that the Association retain the legal title to the lots as security for payment of the purchase price, that it accept and receive annual payments thereon of not less than $30,000 cash, and that the partnership, in lieu of the down payment, would enter upon and improve, advertise and market the lots at its own expense in the same manner as if it held legal title thereto, substantially all of the amounts derived from the sale thereof to be turned over by the partnership to the Association and credited upon the agreed purchase price of $253,608.85 for the entire tract. The Association agreed to the terms proposed by the partnership and instructed its president to enter into a contract of sale to carry out those terms. The result was the written instrument herein referred to as the contract of March 10, 1910. The partnership, under that contract, immediately entered upon the lots and improved, advertised and sold them at its own expense. As the selling price of the lots was collected, 90 per cent thereof was turned over to the Association and applied on the amount for which the Association had agreed to sell the entire tract to the partnership. The payment of the entire amount of $253,608.85 was finally completed by the partnership in the year 1917 and the Association shortly thereafter conveyed to the partnership the legal title to the lots remaining unsold and also assigned to it all outstanding contracts of sale.

At the hearing, two members of the partnership, and also the president of the Association, who executed the contract of March 10, 1910, on behalf of the Association, testified that it was intended by the parties to that contract to provide thereby for the sale by the Association to the partnership of the lots described therein for $253,608.85, the Association to retain title thereto merely as security for the payment of the purchase price. Counsel for the Commissioner objected to the admission of this testimony on the ground that the instrument is free from any ambiguity and speaks for itself and that its terms can not be varied or changed by parol evidence. We think the testimony is competent and admissible. As this Board has said heretofore, in the *Appeal of Converse & Co.*, 1 B. T. A. 742:

The rule against varying or contradicting writings by parol evidence obtains only in suits between and is confined to parties to the writing and their privies and has no operation with respect to third persons nor even upon the parties themselves in controversies with third persons. *Sigua Iron Co. v. Greene*, 88 Fed. 207; *O'Shea v. New York, C. & St. L. R. Co.*, 105 Fed. 559; *Mitchell v. McShane Lumber Co.*, 220 Fed. 878.

From the evidence in this appeal, we are of the opinion that it was intended by the parties to the instrument of March 10, 1910, to con-

tract for the sale to the partnership of the lots in question for the sum of $253,608.85, and that the partnership on March 1, 1913, had an equitable interest in the lots, which at that time had not been conveyed to third parties, and in the outstanding contracts of sale.

In view of what we have hereinabove said, there only remains for determination the question as to the value on March 1, 1913, of the interest of the partnership in the lots and sales contracts referred to. The evidence clearly shows, to our mind, that on that date there were 481 of the 1,462 lots involved herein unsold or not under contract of sale to third parties and that these lots had a fair market value at that time of $197,008.48. The fair market value of the outstanding contracts of sale, on which payments were being made, is shown by the evidence to have been $225,977.13 on March 1, 1913. The partnership at that time still owed the Association, under the contract of March 10, 1910, the amount of $143,555.24. The value of the partnership's interest in the lots and sales contracts was, therefore, $279,430.37 on March 1, 1913, and that value should be taken into consideration in computing the partnership income for the years 1917 to 1920, inclusive, arising from the sale of the lots and collections on the contracts, and the taxpayer's distributive share of the partnership income should be adjusted accordingly.