## JAMISON COAL & COKE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 31690, 34088. Promulgated November 2, 1931

*W. A. Seifert, Esq.*, and *Frank C. Miller, C. P. A.*, for the petitioner.

*J. E. Marshall, Esq.*, and *John A. McCann, Esq.*, for the respondent.
*Walter S. Orr, Esq.*, as *amicus curiae.*

558

OPINION.

TRAMMELL: The petitions as amended allege that the respondent has failed to compute correctly the invested capital of the petitioner for the taxable years 1917, 1918 and 1920. The petitions contain the following statement as the facts relied on in support of this allegation of error:

The petitioner in the year 1910 was a party to a reorganization and acquired substantially all of the property of the Georges Creek Coal & Iron Company, paying therefor in securities and cash. This reorganization took place on or about February 1, 1910. The petitioner acquired properties having a value of $16,920,659.89 as of this date, which results in a paid-in surplus of $7,945,966.66, thereby increasing invested capital of the petitioner in the sum of $7,945,966.66.

It is also stated that, in determining invested capital for the years 1917, 1918 and 1920, " The petitioner is entitled to have included therein the realized appreciation of the properties of the petitioner based upon the difference between the March 1, 1913, value and cost  *  *  *."

In his answer the respondent denies the allegation of error complained of, as well as the statement of facts relied on by the petitioner.

With respect to the issue thus presented by the pleadings the parties have stipulated as follows:

If it is held that there was a reorganization of the petitioner in 1910, its invested capital, as a result of such reorganization, should be increased as follows:

| Year | Amount |
|---|---|
| 1917 | $3, 315, 929. 57 |
| 1918 | 3, 186, 828. 56 |
| 1919 | 3, 086, 232. 92 |
| 1920 | 2, 999, 877. 15 |

The parties also stipulated that " The only issues for determination by the Board are  *  *  *  and (2) reorganization."

The petitioner's brief, under the caption, " Statement of Points Upon Which Petitioner Relies," contains the following: " Point 1. Petitioner was reorganized in 1910, and is entitled to have its invested capital increased as a result thereof."

Under the caption, "Argument," the petitioner's brief contains the following:

POINT I.

*Petitioner was reorganized in 1910 and is entitled to have its invested capital increased as a result thereof.*

The petitioner company was reorganized as of January 10, 1910, through the purchase of substantially all of the Georges Creek Coal & Iron Company property; the increase of its authorized and outstanding capital stock; the increase of its authorized and outstanding bond obligation, and the declaration of a stock dividend, all of which were essential to the plan of reorganization whereby the petitioner acquired the operating property of the Georges Creek Coal & Iron Company located in the State of West Virginia.

*    *    *    *    *    *    *

The agreement [the stipulation setting forth the amounts by which petitioner's invested capital is to be increased for the respective years if it is found that there was a reorganization in 1910] showing the adjustment of petitioner's invested capital by recognizing the reorganization in 1910, is a clear expression of the intention of the parties to leave for decision to the Board solely the question as to whether or not a reorganization of the petitioner had taken place in January, 1910. There is no dispute and no issue before the Board for decision relative to a modification of petitioner's invested capital on account of the reorganization of the petitioner in 1910.

In his brief the respondent states the issue with respect to invested capital to be "(1) Whether a reorganization took place in the Jamison Coal & Coke Company as of January 1, 1910, *which gave the petitioner the right to make a revaluation*, it being stipulated that if there was *such* a reorganization petitioner's invested capital should be increased in the amounts of $3,315,929.57, $3,186,828.56, $3,086,-232.96 and $2,999,877.15 for the years 1917, 1918, 1919 and 1920, respectively." (Italics ours.)

In his opening statement counsel for the petitioner stated: · "There is a question as of January 10, 1910, whether a reorganization took place in the Jamison Coal & Coke Company, *which gave us the right to make a revaluation*, and it is stipulated that if it is held that there was a reorganization of the petitioner in 1910, its invested capital, as a result of such reorganization, should be increased as follows." (Italics ours.) He then stated the amounts set out in the stipulation heretofore quoted.

The foregoing statements have been set forth at length to show just what the parties consider to be the effect of their stipulation and what they consider to be the issue submitted for determination. From the petitioner's brief it appears that it considers the only question with respect to invested capital before us to be whether under the facts in the case there was a reorganization of the petitioner in 1910, while from the respondent's brief it appears that he considers the question to be *whether there was such a reorganization of the petitioner in 1910 as gave it the right to make a revaluation of the property* acquired in that year from the Georges Creek Coal & Iron Company. Considering the entire record, including the opening statements of counsel, we think the question to be decided by us is whether the purchase by the petitioner of the property of the Georges Creek Coal & Iron Company in 1910, together with the attendant and incidental transactions as set out in our findings of fact, so affected the petitioner's invested capital that in order for it to be correctly determined under the Revenue Acts of 1917 and 1918 it must be increased for the years here involved by the amounts stipulated by the parties. If we regarded it otherwise, it would amount to permitting the parties to stipulate the law. Stipulations can relate only to facts. We can not recognize or give effect to stipulations of law. See *Marquissee* v. *Commissioner*, 11 B. T. A. 334; affirmed by the Circuit Court of Appeals February 16, 1931 (Prentice-Hall Federal Tax Service, 1931, p. 825); *Ohio Clover Leaf Dairy Co.*, 8 B. T. A. 1249; affirmed by the Circuit Court of Appeals for the Sixth Circuit, 34 Fed. (2d) 1022.

In its brief the petitioner devotes its argument on this issue entirely to the question of whether there was a reorganization in 1910. It

makes reference to the provisions of section 208 of the Revenue Act of 1917 and section 331 of the Revenue Act of 1918. These sections contain prohibitions on the inclusion of assets in invested capital at greater values than allowable to the preceding owners where such assets were acquired in the reorganization, consolidation or change of ownership of a trade or business or the change of ownership of property after March 3, 1917, and an interest or control in such trade or business or property of 50 per cent or more remained in the same persons or any of them. Even if the assets are acquired by another corporate entity, the invested capital is not increased over that of the predecessor under the conditions set out in section 208 of the 1917 Act and section 331 of the 1918 Act. But none of these sections even intimate that, where the same corporation retained the assets, a revaluation of assets would be made, notwithstanding that that corporation might have been reorganized. It may readily be conceded that, if there had been a reorganization which resulted in a new corporation in 1910 and shares of the new corporation had been issued for the assets of the old, the assets would be revalued. Section 326 of the 1918 Act would have provided for such increase by including the then value of assets paid in for stock. Although the word "reorganization" is used in the above mentioned sections of the Acts of 1917 and 1918, the petitioner admits that neither of the acts attempts to define it. The petitioner relies, however, on the definition of the term given in section 202 (c) (2) of the Revenue Act of 1921 and section 203 (h) (1) of the Revenue Act of 1924, especially the latter. The definitions contained in these sections specifically relate to matters concerned with the determination of gains or losses and not to the determination of invested capital. There are no provisions in any of the reorganization sections which would supersede section 207 of the Act of 1917 or 326 of the 1918 Act, relating to invested capital. In determining invested capital, which is a creature of statute, we must follow those provisions.

As we perceive the issue, it is immaterial whether the petitioner's purchase of the property of the Georges Creek Coal & Iron Company, together with the incidental transactions, constituted a reorganization in 1910.

The term "invested capital," as used in the Revenue Acts of 1917 and 1918, means (1) actual cash bona fide paid in for stock or shares (2) the actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment and (3) paid-in or earned surplus and undivided profits, not including surplus and undivided profits earned during the year, and (4) and (5)

intangible property paid in for stock or shares, subject to certain limitations. The term does not include borrowed capital; that is, money or other property borrowed, whether represented by bonds, notes, open accounts, or otherwise.

The petitioner purchased the property from the Georges Creek Coal & Iron Company for a money consideration. It was not paid in for stock. It is therefore not entitled to include such property in its invested capital at more than cost. *H. T. Cushman Mfg. Co.*, 2 B. T. A. 39; *Klamer-Goebel Furniture Co.*, 11 B. T. A. 1322; *La-Belle Iron Works* v. *United States*, 256 U. S. 377. See also *A. C. F. Gasoline Co.*, 6 B. T. A. 1337; *Pacific Coast Redwood Co.*, 5 B. T. A. 423. It may well be that in the *LaBelle Iron Works* case, *supra*, there was such a reorganization as is contemplated by the later revenue acts, but we think that case is authority for holding that invested capital should not be increased under the facts.

No stock having been issued by the petitioner for assets other than that sold by it to its stockholders for cash, and no part of the excess, if any, of the actual cash value of the property purchased from the Georges Creek Coal & Iron Company over the purchase price paid therefor being includable in the petitioner's invested capital either as paid-in surplus or as earned surplus, we find nothing in the case to warrant the increases in petitioner's invested capital by the amounts stipulated by the parties for the respective years, or for any other amounts than those indicated in the preceding paragraph. It not having been shown that the respondent did not include such amounts in making his determination, his action is sustained as to this issue.

The petitioner contends that for the years 1918 and 1920 it is entitled to deductions of $133,004.40 and $105,280.70, respectively, representing minimum rents or royalties in excess of rents or royalties based on actual production during those years under the Thaw and Fuller leases. Of the amount contended for for 1918, $83,004.40 is applicable to the Thaw lease and $50,000 to the Fuller lease, while of the amount contended for for 1920, $15,446.20 is applicable to the Thaw lease and $89,834.50 is applicable to the Fuller lease.

The Thaw lease was for a period of 40 years from January 1, 1918. It provided for certain stipulated rents or royalties per ton of coal mined. It also provided that from January 1, 1918, to December 31, 1954, the rents or royalties in any one year should in no event be less than a sum based on a minimum production of not less than 250,000 tons of coal per year, whether the actual production of coal during said year should amount to 250,000 tons or not. For the remaining years of the lease rents or royalties on lesser amounts of minimum

production were provided. The lease provided that if for any year the rent or royalty paid based on the minimum production specified for that year exceeded the rent or royalty due on the actual production for such year, the excess or difference could be applied in the subsequent year or years of the lease to the rent or royalty for such year or years when the actual production exceeded the minimum specified for such years. In order that the mining of the coal contained in the leased property should be gradual and that its exhaustion should not occur until at or near the end of the term of the lease, it was provided that not more than 500,000 tons of coal should be mined in any one year. This amount, however, was exceeded in 1924 and 1925.

The Fuller lease was for the term beginning June 15, 1918, and ending September 1, 1928, when the lands and the coal remaining unmined were to be conveyed to the petitioner herein. The lease provided for a stipulated rent or royalty of 35 cents per ton for the coal mined. It also provided that the rent or royalty for the period ending August 31, 1919, should be based on a minimum removal of 250,000 tons of coal, whether the actual production of coal during that period should amount to 250,000 tons or not. The minimum rent or royalty for the yearly periods thereafter was to be based on a minimum removal of 450,000 tons of coal whether the actual coal removed reached 450,000 tons or not. The lease further provided that if during the period ending August 31, 1919, or if in any year or years of the term of the lease, the petitioner should pay for more coal than it had actually mined, it would be entitled to a credit for the same on account of coal mined in any later year or years in excess of the minimum royalty for such year or years. Any and all payments made during the term of the lease which should exceed the value of the coal actually removed prior to September 1, 1928, computing the value of the same at 35 cents per ton, being the rent or royalty under the lease, were to be credited on the purchase price of the premises. The lease also contained provisions as to how the quantity of coal remaining unmined at September 1, 1928, should be ascertained and how the amount to be paid the lessors therefor should be determined, as well as the manner in which payment of such amount should be made. Under this lease the petitioner was not only entitled to have the excess of the minimum rents or royalties over the rents or royalties on the coal actually mined for any year or years of the term of the lease applied against the rents or royalties on the coal actually mined above the minimum rents or royalties for a subsequent year or years, but was entitled to have applied against the purchase price of the property in 1928 any and all amounts paid

during the term of the lease in excess of the value of the coal actually removed.

Since the petitioner was to have as a credit against the purchase price of the property the excess of the amounts paid during the term of the lease over the value of the coal removed during the term of the lease, it is clear that such excess would represent payment for the property. The provisions of paragraph 18 of this lease indicate that while the instrument is designated a lease, it is in fact a contract of sale, intended by the parties as such, and as such comes within the decision in *Jefferson Gas Coal Co.* v. *Commissioner*, 52 Fed. (2d) 120. In that case it was held that where as a result of payments made by the taxpayer under a contract of sale it acquired an equity in property, the payments constituted capital expenditures and were not allowable deductions in determining taxable income. Whether the so-called lease be considered as a lease or a sale, it was manifestly the intention of the parties that any amount paid as so-called royalties in excess of royalties on coal actually mined was to be applied as a part of the purchase price. The lessee was to have the benefit in the form of payment for property to which title was being taken or an equity acquired. On the reasoning of this case in so far as the Fuller lease is concerned, we think that the minimum royalties in excess of royalties on coal actually mined are to be treated as capital expenditures and are not deductible as expense.

With respect to the Thaw lease, since we are not bound by the State court decisions as to whether this is a lease or a sale of coal in place (see *Rodenberger* v. *McCaughn*, 25 Fed. (2d) 699, certiorari denied), we must determine from its terms whether the payments were rentals or royalties, or purchase price. We think that, clearly, for Federal income-tax purposes the payments are to be treated as royalties.

In *W. S. Bogle & Co. et al.*, 5 B. T. A. 541, 552, where the Board considered the question of whether minimum royalties paid are deductible as expenses or should be carried in the capital account we said:

With reference to the minimum royalties, we are of the opinion that they constitute rent and are allowable deductions. It is well settled that royalties paid under the provisions of mining leases constitute rents. *Appeal of Estate of Mary E. McCahill*, 2 B. T. A. 875; *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364; *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503; and *United States* v. *Biwabik Mining Co.*, 247 U. S. 116. The mere fact that the basis of computing such rents is at a rate of so much per ton, provided a certain quantity of ore or coal is removed, or is fixed at a certain specified amount if the required quantity is not mined, does not in any way affect the nature of the payment.

In the *Bogle* case the record discloses that the minimum royalties involved in excess of royalties on coal actually mined might be applied against the royalties due on coal mined in the later years of the lease, as is true in this case, although no reference thereto was made by the Board.

In *Marsh Fork Coal Co.*, 11 B. T. A. 685, 693, reversed on another point, 42 Fed. (2d) 83, the Board said with respect to the inclusion of minimum royalties in invested capital:

The claim of the petitioner that certain royalties and taxes paid on inactive and undeveloped land be restored to capital is denied, first, because nothing in the lease indicates that a separate royalty was to apply to each tract or that such royalties accrued to the credit of the petitioner and could be satisfied by unlimited future shipments, and, second, because items such as annual rental and annual taxes are deductible as expense each year and are paid for benefits received during the year. The mere fact that the petitioner did not take the fullest advantage of the benefits for which it paid rentals and taxes does not change the character of the expenditures.

We think that those decisions are applicable here.

Minimum royalties are not necessarily advance royalties. They are at most only contingently advance royalties. When a minimum royalty is paid, the taxpayer does not have an absolute equity in unmined coal, as in the case where the excess payments apply on the purchase price or where an advance royalty is paid for the future. He may never have the opportunity to receive any benefits in the future. It all depends upon uncertainties and contingencies which may never happen. When the payments are made it is not known whether the excess over actual royalties can ever be recovered. The recovery clause may or may not be of any benefit, it being dependent upon unknown future conditions. If the taxpayer over the lease period was never able to acquire the benefit of excess minimum royalties over actual royalties, serious problems would arise when too late to make proper adjustment to properly reflect income. We do not think a taxpayer should be required to wait for years in the future to know how he stands with the Government on taxes. We are therefore of the opinion that the minimum royalties in the Thaw lease are deductible as expense. We must keep in mind that the tax laws are on an annual basis, and this is annual royalty or rental required to be made.

The minimum royalties are required to be paid each year for the continued use or possession of the property to which the taxpayer has not taken and is not taking title and in which it acquires no absolute equity. This brings the case within the scope of deductions allowed by section 234 (a) (1) of the Revenue Act of 1918.

*Judgment will be entered under Rule 50.*