SAN JOAQUIN FRUIT & INVESTMENT COMPANY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6989, 20801, 27038, 35835, 40407, 42726, 49317, 52253.

Promulgated June 15, 1933.

*Joseph D. Peeler, Esq., George M. Naus, Esq.*, and *N. L. McLaren, C.P.A.*, for the petitioner.

*J. R. Johnston, Esq.*, for the respondent.

#### OPINION.

SEAWELL: These proceedings were consolidated for hearing and report, and involve the redetermination of deficiencies in income and excess profits taxes for 1920 and 1921 in the respective amounts of $22,872.09 and $21,867.40; deficiencies of $58,422.79, $2,898.43, $10,965.80, $17,663.58, $20,177.14, and $3,061.39 in income taxes for 1922, 1924, 1925, 1926, 1927, and 1928, respectively; and the liability of the petitioner as a transferee for unpaid income and excess profits taxes of the San Joaquin Fruit Co. for 1921 in the amount of $21,867.40.

At the threshold we are confronted with a motion of the respondent asking that we make the decision of the court in *Burnet v. San Joaquin Fruit & Investment Co.*, 52 Fed. (2d) 123; reversing, in part, 16 B.T.A. 1290, the judgment of this Board as to Docket Nos. 6989 and 20801 for 1920 and 1921, and that his determination of petitioner's income tax liability be approved.

The facts necessary to a consideration of the motion, briefly stated, are as follows: A consolidated hearing was held in Los Angeles, California, May 3, 1927, on all of the issues raised in Docket No. 6988 for 1918 and 1919 (not now involved) and Docket Nos. 6989 and 20801, except the one involving special assessment, which was not tried because of the refusal of the Commissioner of Internal Revenue to answer a subpoena to produce comparatives. Upon the conclusion of the hearing, orders were entered continuing the proceedings to the reserve calendar pending a decision in the case of *Blair* v. *Oesterlein Machine Co.*, 275 U.S. 220. Thereafter in 1928 amended and supplemental petitions were filed in the proceedings in which, among other things, it was alleged that the petitioner was not organized until 1922 and therefore was not liable for the proposed deficiencies. The proceedings were consolidated and set for hearing on October 16, 1928, at which time the petitioner submitted evidence on the new issues raised in the amended petitions. The deficiency notices for 1918, 1919, and 1920 were mailed to the petitioner, and the notice for 1921 was addressed to the San Joaquin Fruit Co., hereinafter referred to as the "Fruit Co.", in care of the petitioner.

In a decision promulgated June 29, 1929 (16 B.T.A. 1290), the Board held that the petitioner was not organized until 1922 and, accordingly, was not liable for the deficiencies proposed against it for 1918, 1919, and 1920, and that, as the deficiency notice for 1921 was not mailed to the petitioner, the Board was without jurisdiction to hear the proceedings for that year. Appropriate orders were thereupon entered that there were no deficiencies for 1918, 1919, and 1920, and dismissing, for lack of jurisdiction, the proceedings in so far as they related to 1921.

The respondent took an appeal from the decision to the Circuit Court of Appeals for the Ninth Circuit. The court sustained the Board as to 1918 and 1919 and reversed its decision as to 1920 and 1921, the former ruling being in accordance with an admission made by counsel for the Government that the deficiencies were barred by the statute of limitations. On August 4, 1931, after the receipt of the court's mandate affirming the Board's decisions as to 1918 and 1919 and reversing it as to 1920 and 1921 and commanding "that such further proceedings be had in such cause as according to right and justice and the laws of the United States ought to be had," this Board, by appropriate order, placed Docket Nos. 6989 and 20801, applicable to the years 1920 and 1921, respectively, on the Day Calendar of October 5, 1931, for hearing on the merits. Thereafter the respondent consented to a motion of the petitioner for the transfer of the proceedings to the Circuit Calendar.

By motion filed October 13, 1931, the respondent alleged, among other things, that all of the issues involved in the proceedings for 1920 and 1921 had been tried on May 3, 1927, with the exception of the issue relating to special assessment, and asked that the Board set a time for the filing of briefs upon questions other than special assessment, and that after the issues were decided, to set the case down for hearing on the special assessment question. The petitioner opposed the motion. A hearing was had on the motion with the result that on January 9, 1932, an order was entered denying the respondent's motion to decide the issues involved other than special assessment on the then record and continuing the proceedings on the Circuit Calendar " for the presentation of such other and further evidence respecting the issues herein as the parties may be advised." In April 1932 the proceedings, and other cases involving identical issues raised by the petitioner for later years, were placed on the Circuit Calendar for hearing. A consolidated hearing was held at Los Angeles, California, May 23–24, 1932, at which the respondent moved to make the aforesaid decision of the circuit court the Board's decision for 1920 and 1921. The presiding Member reserved judgment on the motion and proceeded to hear testimony on all of the issues raised in all of the petitions, except special assessment.

The underlying theory of the respondent's contention is that the decision of the circuit court of appeals settled all of the issues raised by the petitioner in Docket Nos. 6989 and 20801 for the years 1920 and 1921, and for the Board to receive further evidence on the issues and render a decision thereon would amount to a review of the judgment of the appellate court.

The petitioner is not asking us to review the decision of the appellate court with the view of reaching a contrary conclusion. All it seeks to do is to have us decide questions raised on the merits in the light of all the evidence of record, issues it contends were not decided by this Board or the circuit court of appeals.

The hearing had in Los Angeles in 1927 was not a full and complete one on the merits, and it appears from the record, as we pointed out in our order of January 9, 1932, that counsel for the petitioner contemplated the introduction of other and further evidence to support its allegations. The hearing had in October 1928 was confined to the law questions raised by the amended petitions, and in the Board's report of the hearing, the findings of fact, and decisions related only to such questions, the questions on the merits not being regarded as submitted for decision. In his appeal to the circuit court of appeals from the Board's decision, the respondent alleged as error only the matters decided by the Board, alleging that such evidence as had been offered on the other questions was immaterial to a review of the decision.

An examination of the court's decision discloses that it did not discuss or decide questions other than those passed upon by the Board. After setting forth in full the Board's findings of fact and opinion, the court discussed the effect of petitioner's action before this Board and the sufficiency in law of the respondent's notice to the Fruit Co. as a notice to the petitioner, without mentioning questions raised on the merits.

The court's reversal of our decision did not directly or indirectly settle the questions now before us; hence it made no rulings which may be regarded as controlling the questions on the merits. As to them, the petitioner has not had its day in court and is entitled to a decision from the Board. Accordingly, the respondent's motion is denied.

The petitioner questions our jurisdiction to hear the proceedings in so far as they relate to 1922 on the ground that it has received no deficiency notice for that year.

On February 28, 1927, the respondent mailed a deficiency notice to the Fruit Co., informing it of a deficiency of $58,422.79 in income taxes for 1922. Within the time allowed by law the petitioner filed a petition with the Board, alleging several errors in the determination of the deficiency. The petition is captioned " San Joaquin Fruit & Investment Company, Successor to San Joaquin Fruit Company, through change of name only," and is signed " San Joaquin Fruit & Investment Company (formerly San Joaquin Fruit Company) By C. V. Newman, Secretary." In the verification of the petition it is stated that the San Joaquin Fruit & Investment Co. succeeded the San Joaquin Fruit Co. " through change of name only during the year 1922 and is the petitioner referred to in the foregoing petition."

We had the identical question before us in San Joaquin Fruit & Investment Co., *supra*, for the year 1921, and from facts in all material respects the same as those here we found that the deficiency notice was not a notice to the petitioner, and held that we lacked jurisdiction to hear and decide the proceeding. On appeal, the Board was reversed. *Burnet* v. *San Joaquin Fruit & Investment Co., supra*. We feel bound by the court's decision for the prior year in view of the right of appeal to the same court from our decision for the taxable year. Accordingly, we hold that we have jurisdiction to hear and decide the issues raised for the year 1922.

The issues on the merits presented for decision are (a) the proper basis for determining the amount of gain realized or loss sustained on the sale of certain land in each of the years 1922 to 1928, inclusive, and the computation of depreciation on walnut and orange trees in all of the taxable years; (b) whether invested capital should be

increased for the years 1920 and 1921; and (c) whether a loss of $14,272 was sustained in 1926 on account of the removal of certain walnut trees from petitioner's land. The special assessment issue applicable to 1920 and 1921 was abandoned.

In 1906 C. E. Utt and Sherman Stevens negotiated a certain lease from the Irvine Co. for 1,000 acres of bare and unirrigated land in Orange County, California, the acreage being part of a 100,000-acre tract of land owned by the lessor. Subsequently in 1906 the Fruit Co. was organized under the laws of California with a capital of $100,000, divided into 1,000 shares, each of the par value of $100, for the purpose of executing the lease. The Irvine Co., a West Virginia corporation, C. E. Utt and Sherman Stevens each purchased at par 270 shares of the stock. No additional stock was ever issued. All of the stock of the Irvine Co., except qualifying shares, was owned by James Irvine.

On October 13, 1906, the Irvine Co. leased the land to the Fruit Co. for a term of ten years beginning December 1, 1906. By the terms of the lease the lessee was required, among other things, to plant all of the land to fruit trees within four years at its own expense; to grow crops of grain, beans and other products on such other portions of the land as could be cultivated without material injury to the fruit trees; and to sink wells for and develop sufficient water on a designated tract of nearby land owned by the lessor for use in producing crops on the leased land. The lessor was to receive as rent for the land one fourth of the crops produced by the lessee on the leased premises. The lessee was given an option to purchase not in excess of 500 acres of the land before the expiration date of the lease at $200 per acre cash, and all of the tract at the expiration of the lease at the same price, payable one fourth cash and the balance within five years. An exercise of the right to purchase portions of the tract during the life of the lease worked a termination of the option to purchase all of the tract on the expiration of the term of the lease. The lessee could not assign or transfer the lease, or sublet any portion of the land, without the written consent of the lessor.

Within two years the lessee developed the amount of water required by the lease for irrigation purposes and by the close of 1910 expended from $150,000 to $170,000 in developing and improving the tract.

On November 30, 1916, the Fruit Co. exercised the option given in the lease to purchase the property.

In 1907 the lessee planted 140 acres of the tract to orange trees and 500 acres to walnut trees. In 1909 it increased the acreage of orange trees to 390 and walnut trees to 600.

The San Joaquin Fruit & Investment Co., the petitioner, was organized in July 1922, under the laws of California, with a capital

stock of $1,500,000 divided into 15,000 shares, each of the par value of $100. The stockholdings of C. E. Utt, Sherman Stevens and the Irvine Co. in the Fruit Co., amounting to 810 shares, were surrendered November 6, 1922. The surrendered stock was immediately reissued, the petitioner receiving 807 shares, and C. E. Utt, Sherman Stevens and James Irvine, Jr., one qualifying share each. On the same day the petitioner issued shares of its stock as follows in exchange for the stock it had received of the Fruit Co.:

| | Shares | | Shares |
|---|---|---|---|
| Irvine Co | 4,998 | Sherman Stevens | 5,000 |
| James Irvine | 1 | C. E. Utt | 2,500 |
| James Irvine, Jr | 1 | Margaret R. Utt | 2,500 |

No new capital was put into the petitioner at the time of the issuance of its stock.

The directors of the Fruit Co. on November 6, 1922, called a meeting of the corporation's stockholders for November 18, 1922, for the purpose of considering the question of dissolving the corporation. The meeting was held on the called date, at which the stockholders adopted a resolution to liquidate and dissolve the corporation. On November 21, 1922, the directors of the Fruit Co. filed a petition with the Supreme Court of the County of Orange, State of California, for the dissolution of the corporation. On the same day the court ordered the filing of the application and the advertising thereof for a period of 30 days, and set the proceeding down for further hearing on December 26, 1922. At some undisclosed time between the filing of the petition and December 26, 1922, C. E. Utt, Sherman Stevens and James Irvine, Jr., assigned their stockholdings in the Fruit Co. to the petitioner. On December 26, 1922, said court found the petitioner to be the sole stockholder of the Fruit Co. and ordered all of the latter's assets to be transferred to the former. The Fruit Co. was dissolved December 26, 1922. At or about that time the petitioner surrendered the stock of the Fruit Co. and received therefor all of the corporation's assets.

The physical assets of the Fruit Co. were taken up on the books of the petitioner at the value of $1,206,000 in round figures in accordance with an appraisal made of the properties as of November 15, 1922.

In determining the deficiencies the respondent computed depreciation on orange and walnut trees and determined gains realized from sales of acreage each year, commencing in 1922, on the basis of the actual cost of the assets to the Fruit Co. The petitioner argues as to the years 1920, 1921, and 1922, that the exercise of the option to purchase in 1916 operated to convert capital assets, consisting of a vested property right, a valuable option and purchase money, into

a fee simple title, a taxable transaction, giving rise to a new basis, namely, the value of the land and trees on the date the option was exercised. In the alternative, it is claimed, among other things, that the Fruit Co. had an equitable interest in the assets prior to the exercise of the option and for all practical purposes was the owner of the property during that period; that the instrument of October 13, 1906, should be construed as a sale of the land, and, one or more of these things being the case, the proper basis is the March 1, 1913, value of the land and improvements, or the value at that time of the option, plus $200,000, the price paid upon its exercise.

We will first consider the character of the agreement of October 13, 1906. The execution of the agreement of October 13, 1906, was preceded by negotiations between Utt and Stevens, experienced orchardists, and the Irvine Co., represented by James Irvine, its principal stockholder, for a purchase by the former of 1,000 acres of the 100,000-acre ranch owned by the Irvine Co. Irvine preferred to sell the land outright, but had grave doubt as to the ability of Utt and Stevens to finance the purchase on their limited capital of about $30,000 each, particularly in view of the absolute necessity of making a large capital outlay at once for water for irrigation purposes. A lease of the desired land was suggested by the owner, but Utt and Stevens expressed unwillingness to enter into the venture unless it would involve more than a lease. Irvine then endeavored to persuade Utt and Stevens to take a smaller tract of land, but without avail. All of them were confident that the proposed operations would be a success, provided water could be found nearby in sufficient quantities, and while they were confident that water could be developed, the quantity obtainable was then unknown. Further negotiations resulted in an agreement on the part of the owner to involve 1,000 acres in the deal and to join Utt and Stevens in the venture on an equal basis to increase the chances of success. The Fruit Co. was then formed to execute and carry out the contract.

The instrument in question was drafted by Irvine. It is designated a lease, and throughout refers to the owner as the "lessor" and the Fruit Co. as the "lessee." It provides that the "Lessor hereby leases to the said Lessee"; and makes provisions for the retention of title to the land by the lessor until the completion of the installment payments to be made in case the option granted to purchase was exercised; the payment of taxes and assessments on the land by the lessor "until said lands have been sold to the said lessee, or its assigns, as herein agreed"; and for the retention by the lessor of one fourth of the crops produced "as rent" for the property. No provision was made in the instrument for the application of rent money to the purchase price of the property in case the option was

exercised, a condition that existed in the document involved in *Robert A. Taft*, 27 B.T.A. 808, and the facts are by no means parallel to those in *Arthur B. Grover*, 3 B.T.A. 508. The instrument itself is opposed to the idea of a sale.

The testimony offered does not prove that the intention of the parties to the instrument was to make a sale of the land. Negotiations were commenced by Utt and Stevens with the express purpose of buying the land, but their offers to buy were declined for reasons already given. They took the next best thing obtainable from their standpoint, namely, a lease with an option to buy portions of the land for cash during the term of the lease or all of it upon its termination, on terms. Irvine testified for the petitioner on direct examination that he " could not have sold it to them in any other way; they could not have bought it  *   *   *, they did not have the financial means to buy it; impossible." Other testimony of his shows that the Irvine Co. executed a great many other instruments along the same line. Other witnesses testified that failure to exercise the options granted in such instruments was the rule rather than the exception.

We have no doubt that at the time the agreement was entered into the Fruit Co. believed the venture would be sufficiently successful to justify the exercise of the option as to a portion or all of the tract, but much more is required to show an intention to buy and sell under a particular instrument. Profit was the evident object of the transaction, and had the venture been unsuccessful the lessees would probably have permitted the option to lapse with the expiration of the lease. We construe the document to be a lease, with option to purchase, as it purports to be, and not a contract of sale, and will proceed to decide the issues accordingly.

There is testimony in the record that the option was a valuable property right in the hands of the Fruit Co. and that the land in question had a value in November 1916, considerably in excess of the price paid for it. Had the acquisition of the land at that time not been through the exercise of an option to purchase, granted ten years before, there could be no question that the basis to the purchaser would be actual cost of the land. Does the fact that the property was under option for ten years prior to its purchase affect the situation? We think not.

The subject matter of the 1916 transaction was not the option, but the land itself. The option was merely the instrumentality through which the property was acquired. While the exercise of the right to purchase by the optionee might have resulted in taxable gain or deductible loss to the lessor, it was not a taxable transaction to the Fruit Co. As to it, there was a mere conversion of a right given to

purchase into a contract of sale of the land (*Smith* v. *Bangham*, 156 Cal. 359; 104 Pac. 689), without resulting gain or loss.

The granting of the option to purchase was not a sale of the land; only a sale of the right to purchase the property. *Smith* v. *Bangham, supra; Hicks* v. *Christeson*, 174 Cal. 712; 164 Pac. 395; *Menzel* v. *Primm*, 6 Cal. App. 204; 91 Pac. 754. Under the great weight of authority, the Fruit Co., as optionee of the land, had no interest, legal or equitable, in the property. *Richardson* v. *Hardwick*, 106 U.S. 252; *Todd* v. *Citizens' Gas Co. of Indianapolis*, 46 Fed. (2d) 855; certiorari denied, 283 U.S. 852; *Ludy* v. *Zumwalt*, 85 Cal. App. 119; 259 Pac. 52. It was not, therefore, until the exercise of the option that the Fruit Co. acquired an interest in the property. Such interest as it had in the land during 1920, 1921, and 1922 was acquired by reason of the conversion of the right of purchase into a contract of sale in 1916, at a cost of $200,000.

The case of *People's Street Ry. Co.* v. *Spencer*, 156 Pa. 85; 27 Atl. 113, is cited to show that the Fruit Co. should be regarded as the owner of the land from 1906 because of its exercise of the option. The reasoning of the court in that case was based upon the theory that the transaction giving rise to the suit was, in substance, a loan of money, whether the parties were lessor and lessee, vendor and purchaser, or mortgagor and mortgagee, not being considered important, and that the railway company had an equitable interest in the property at the time in question. When construed in the light of such conclusions, the decision lacks force as supporting a view that the optionee here should be considered as the owner *ab initio*. In this respect the case of *Smith* v. *Bangham, supra*, did not go further than to say that an optionee had such an interest in the optioned property as to " cut off intervening rights acquired with knowledge of the existence of the option." The cases of *Crowley* v. *Byrne*, 71 Wash. 444; 129 Pac. 113, and *Horgan* v. *Russell*, 24 N.D. 490; 140 N.W. 99, are to the same general effect.

Whether the March 1, 1913, value of the land and trees, or the value at that time of the option, is material would seem to turn upon the interest of the Fruit Co. in the property prior to 1916. As we have pointed out, the Fruit Co. had no property right in the land prior to the exercise of the option to purchase and, accordingly, no basis for exhaustion or computing gain or loss. The option expired with the exercise thereof and any value it might have had while in existence can not affect the cost basis of property acquired through it. Not having had any interest in the property prior to 1916, the values of the land and improvements, and the option at March 1, 1913, are, in our opinion, of no importance.

The petitioner claims that the exercise of rights to purchase stock is analogous to the situation here. While a stock right has some of the characterization of an option, it is "essentially analogous to a stock dividend." *Miles* v. *Safe Deposit & Trust Co. of Baltimore*, 259 U.S. 247. When stock acquired through the exercise of such rights is sold, the cost of the stock, not the value of the right when received, is the basis for computing gain or loss on the transaction. *Ayer* v. *Blair*, 25 Fed. (2d) 534.

For 1924 and subsequent taxable years the petitioner is asking that we allow depreciation on the assets and compute profit on sales of parcels of the tract based upon the fair market value of the property on December 26, 1922, when the petitioner is alleged to have received the assets in connection with the liquidation and dissolution of the Fruit Co. It contends that the exchange of stock of the Fruit Co. for its properties in dissolution proceedings was a taxable transaction giving rise to a new basis for the assets acquired. The respondent maintains that the assets in question were not so acquired, but through a reorganization, and that the basis to the petitioner is cost to the transferor corporation.

Section 204 (a) (7) of the Revenue Act of 1924 provides that the basis for determining gain or loss from the sale of the property acquired after February 28, 1913, shall be the cost of such property, except that:

> If the property (other than stock or securities in a corporation a party to the reorganization) was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 80 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

Section 203 (h) and (i) of the same act reads as follows:

> (h) As used in this section and sections 201 and 204—
>
> (1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.
>
> (2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

(i) As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

The basis for allowance of exhaustion of assets under the statute is the same. Sec. 204 (c). The same numbered sections of the Revenue Act of 1926 and sections 112 (i) and (j), 113 (a) (7) and 114 (a) of the Revenue Act of 1928 are to the same effect.

Counsel for the petitioner admit there would be some merit to the respondent's position had there been an exchange of petitioner's stock for property of the Fruit Co. instead of, as it says actually occurred, a surrender of the stock of the Fruit Co. for its assets in dissolution proceedings. We are asked, in effect, to ignore completely the circumstances under which the petitioner acquired the stock of the Fruit Co. and decide the issue without reference to such matters. We do not think the preliminary steps leading up to the acquisition of the Fruit Co.'s property should be ignored in deciding the question. Considered together they clearly show an intention to terminate the existence of the Fruit Co. in favor of the petitioner in the shortest possible time, without a substantial change in stock ownership.

The exchanges of stock by which the petitioner acquired all but three shares of the stock of the Fruit Co. and the old stockholders of that corporation received about 83 percent of the stock of the petitioner, together with the calling of a meeting of the stockholders of the Fruit Co. for November 18, 1922, to consider the matter of dissolving the Fruit Co., all occurred on November 6, 1922. Within three days after the stockholders acted to liquidate the affairs of the Fruit Co., application was made to the appropriate court for a dissolution decree. After advertisement as required by law and on a date set by the court at the first hearing, a further hearing was had on the application. The hearing resulted in a decree of the court for the dissolution of the Fruit Co. and the transfer of all its assets to petitioner, its sole stockholder, the outstanding qualifying shares having previously been transferred to it. Except for the period of about 12 days that could have been saved by obtaining waivers from the stockholders for the meeting held on November 18, 1922, the proceedings were carried out in practically the shortest possible time. When these steps had been completed, all within about one and one half months, the petitioner owned all of the property of the Fruit Co. and the original stockholders of the Fruit Co. held about 83 percent of petitioner's stock. Under these circumstances, we conclude that the assets of the Fruit Co. were not acquired in liquidation proceedings, as contended by the petitioner, but in connection with a reorganization. See *Mente & Co.*, 24 B.T.A. 401; *Flushing Nurseries Co.*, 25 B.T.A. 938.

Immediately after the acquisition by the petitioner of the assets of the Fruit Co. for the latter's stock, the old stockholders of the transferor corporation were in control of petitioner, by reason of their ownership of more than 80 percent of its stock. The transaction thus comes squarely within the reorganization provisions of the statute. Under the statutes the basis to the petitioner is the same as it would have been in the hands of the transferor had it retained the property, with adjustments for gain or loss recognized to the transferor in the exchange. No adjustments are required in these proceedings as no gain or loss was recognized to the transferor. *Mente & Co., supra; Fred A. Hellebush et al., Trustees*, 24 B.T.A. 660; *W. P. Fox & Sons, Inc.*, 15 B.T.A. 115.

There appears to be no controversy as to the price paid for the land, or the cost of the trees. In any event, the petitioner has failed to show that the costs are different from those determined by the respondent and, accordingly, his determinations will not be disturbed.

For each of the taxable years exhaustion of the orange and walnut trees was claimed by the petitioner and allowed by the respondent on the basis of a useful life of $33\frac{1}{3}$ years. The testimony and documentary evidence offered on the question are conflicting. Two qualified witnesses of petitioner testified that orange trees have a productive life of from 30 to 40 years. One of these witnesses expressed the opinion that the productive life of walnut trees is from 30 to 40 years, and the other testified that their life is from 40 to 50 years. Other evidence, consisting of reports prepared by the University of California on production costs of oranges and walnuts in Orange County, California, is that orange and walnut trees have a life for exhaustion purposes of 45 and 60 years, respectively. On the showing made, we do not think the rate used by the respondent is unreasonable. Except for adjustments that may be necessary on account of the proof made of the acreage planted to trees in the taxable years, the respondent's allowances will not be disturbed.

The petitioner contends that if the exercise of the option is held to be a taxable transaction, the invested capital of the Fruit Co. for 1920 and 1921 should be increased by the difference between the November 30, 1916, value of the tract and the purchase price of $200,000, as earned surplus. The respondent made an allowance for invested capital based upon the cost of the land and improvements made thereon by the Fruit Co.

The exercise of the option was not, as we have pointed out, a taxable transaction of the petitioner, but merely resulted in a conversion of the option to purchase into a contract of sale of the property. The assets were acquired solely for cash. Property acquired under such circumstances may not be included in invested

capital at a figure in excess of cost. *Steele, Wedeles Co.* v. *Commissioner*, 63 Fed. (2d) 541; affirming 11 B.T.A. 279; *H. T. Cushman Mfg. Co.*, 2 B.T.A. 39; *Klamer-Goebel Furniture Co.*, 11 B.T.A. 1322; *Jamison Coal & Coke Co.*, 24 B.T.A. 554. On this issue the respondent is sustained.

In its return for 1926 the petitioner claimed a loss deduction of $14,272 on account of the removal of walnut trees from 20 acres of its land. The respondent seems to have reduced the petitioner's basis for the loss from March 1, 1913, value to cost in 1916, resulting in a disallowance of $13,834.17 of the amount claimed.

The issue is not briefed by the respondent and in the briefs filed on behalf of the petitioner it is said that the " controversy turns on the proper basis of the orchard." If that be the only question for decision the respondent must be sustained, as the basis for determining the amount of the deduction for losses on property acquired after February 28, 1913, as this was, is cost. Sec. 234 (a) (4), Revenue Act of 1926.

The respondent would nevertheless prevail on the evidence offered by the petitioner to support the deduction. The allegation of loss made in the petition was denied by the respondent in his answer. Such evidence as we have on the question consists of testimony of Irvine and Utt. The former testified that some walnut trees were removed in 1926 or 1927 to plant the land to orange trees. The testimony of Utt, who has been president of petitioner since its organization and, as such, actively engaged in the conduct of its affairs, is that walnut trees were removed during a period of three or four years, and that he had no recollection of the removal of any of them in 1926. Manifestly this testimony is insufficient to support a finding that the trees were removed in 1926 or that a loss in the amount claimed was sustained in that year. On this issue the respondent is sustained.

There remains for disposition the transferee liability of petitioner for income and excess profits taxes of the Fruit Co. for 1921 in the amount of $21,867.10. The transferee notice was mailed December 29, 1927, more than a year after the mailing of the deficiency notice to the Fruit Co., but before the petitioner amended its petition for 1921 as a taxpayer so as to raise the jurisdictional question. The outcome of the jurisdictional question was, as we have already pointed out, favorable to the petitioner before this Board, but unfavorable on appeal to the Circuit Court of Appeals for the Ninth Circuit.

The petitioner is not liable both as a taxpayer and a transferee for the same taxes, and the statute does not contemplate collection of taxes twice. In view of the anomalous condition in which we find the record, Docket No. 35835 will be placed on the Reserve Calendar,

subject to restoration to the General Calendar for further proceedings on 30 days' notice by either party or the Board's own motion.

Reviewed by the Board.

*Decision will be entered under Rule 50. except in Docket No. 35835.*

---

MURDOCK, concurring: I agree that this case presents the identical question which was before us in *San Joaquin Fruit & Investment Co.*, 16 B.T.A. 1290, on which we were reversed in *Burnet v. San Joaquin Fruit & Investment Co.*, 52 Fed. (2d) 123. With all due respect to the circuit court of appeals which reversed the Board, I still believe that the Board correctly decided that case. However, it was reversed, and this case would go to the same circuit. But the prevailing opinion is misleading in the emphasis placed upon the statements contained in the pleadings that the Investment Co. was successor to the Fruit Co. through change of name only. The facts clearly appear in this case as they did in the other case and the change was not a change of name only. Two different corporations were in existence at the same time.

VAN FOSSAN agrees with the above.