ROBERT A. TAFT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 51084, 66118. Promulgated February 27, 1933.

Robert A. Taft, Esq., pro se.
L. W. Creason, Esq., for the respondent.

OPINION.

SEAWELL: We seek here to know and correctly to determine the true character and meaning of the transaction between the petitioner and Joseph R. Peebles' Sons Company in reference to the lot in Cincinnati mentioned in the papers and other evidence offered at the trial. It seems well settled that calling it a "lease" does not make it such, if, in fact, it is something else. *Heryford* v. *Davis*, 102 U. S. 235. "Leases" of personalty with the privilege of purchase are held conditional sales. *Corbett* v. *Riddle*, 209 Fed. 811; *Burroughs Adding Machine Co.* v. *Bogdon*, 9 Fed. (2d) 54; *Hervey* v. *Rhode Island Locomotive Works*, 93 U. S. 664. "Leases" in reference to realty receive a like construction and upon the facts may be held to be sales. *Alexander W. Smith, Jr., Executor*, 20 B. T. A. 27; *Jefferson Gas Coal Co.* v. *Commissioner*, 52 Fed. (2d) 120; *Herold* v. *Commissioner*, 42 Fed. (2d) 942.

Taking the instrument (of July 9, 1927) by its "four corners", and considering it in the light of the attending facts, we discover that its execution was preceded by an unequivocal offer of the petitioner to "purchase" the property at the price of $185,000. In the case of *E. G. Robertson*, 19 B. T. A. 534, the negotiations preceding the contract in the form of a lease included an oral agreement to purchase the land on the part of the lessee. This was considered

by the Board as important and in the opinion it is said: "The intent of the parties to these transactions being to accomplish sales, we think the law must give such effect to them regardless of the forms employed."

In the instant case the "lease" complied with the terms of the written "offer to purchase" in that the purchase price named therein, $135,000, added to the initial amount of $50,000 paid, makes exactly the $185,000 mentioned in the offer. The rental provided for in the lease after the payment of the $50,000 amounts to just 5 per cent per annum on the deferred payment of $135,000, a fair rate of interest on a loan with safe collateral. The provision of the contract of lease calling for an abatement of the "rent" in the sum of $50 per annum for every $1,000 paid on account of the privilege to purchase discloses the plan to continue a 5 per cent interest charge on the balance remaining due on the contract throughout. The rental value of the property, considered as a mere leasing proposition, was not rendered less by reason of the payments made; but considered as a contract of purchase of the property, of course, the interest should not be charged on deferred payments after they have been met and paid. It is further provided in the lease that if the building should be damaged by fire, tornado or windstorm, the recovery thereon shall be applied to restoring the same, or, at the option of the lessee, paid to the lessor as a partial payment on the privilege to purchase; and the rents thereafter shall be ratably reduced. It accordingly appears that for every payment on the balance owing on the contract there shall be a reduction of "rent"; while, although the building on the property might be totally destroyed with insufficient insurance funds to restore it to a condition of productivity, there is no provision of abatement of rent.

Another significant indication of the intention of the parties is the binding obligation of the petitioner, in any event, to pay, in addition to the initial payment of $50,000, the sum of $25,000 on July 10, 1932 (which was paid), and also $25,000 on July 10, 1937, a total of $100,000. Moreover, the petitioner is further obligated under the lease, to continue to pay the 5 per cent per annum on whatever amount of the original $185,000 remains unpaid until 1942, whether he decides to exercise, or not to exercise, his privilege to purchase in the meantime.

Considering all these facts and circumstances, it is not strange that the president and the representative of The Company, at the time, considered the transaction a sale, as he testified; nor that the petitioner himself should have testified, as he did in substance, that

when the agreement was executed in 1927, he supposed that in 1942, with the stipulated payments having been made, the payment of the further sum of $85,000 would appear so advantageous to him that, of course, he would make it and take over the fee simple title to the property. It would appear difficult, in fact, to reach any other conclusion than that at the time of the execution of the paper dated July 9, 1927, and by it, considered in connection with the written offer of the petitioner to purchase, the parties intended a sale. Petitioner says, however, that while in Ohio leases with privilege to purchase, and perpetual leases are frequently referred to as sales, and while heavy initial payments and other fixed payments make more probable the exercise of the privilege to purchase, they do not compel such exercise, and that he has not yet elected to be a purchaser in this case and is consequently a lessee. In support of his position he cites article 130 of Regulations 74, and *Weiss* v. *Wiener*, 279 U. S. 333; *Alameda Park Co.*, 10 B. T. A. 1115; and *Baton Coal Co.*, 19 B. T. A. 169.

The regulation referred to has no application, if the transaction we have under review was in fact a sale. In *Weiss* v. *Wiener, supra*, there was no contention that the lessee of the long term leases was really the owner of the buildings which he held under the leases. The Circuit Court of Appeals, however, said: " For every practical purpose they are his buildings, and in our opinion they are his capital so far as they are consumed in his business." With this conclusion the Supreme Court did not agree and it reversed the Circuit Court of Appeals, saying: " He [Weiner, holder of the lease] must show an interest in the property and a present loss to him to make the statute apply." Wiener sought not to spread the cost of his leases over their terms, in aliquot part deductions, as the petitioner in the instant case does, but to obtain obsolescence on buildings he held under lease contracts. Likewise, in *Alameda Park Co., supra*, there was no contention as to the nature of the transaction called a lease, but the lessee sought to deduct as operating expenses in 1917 all its income for that year which it had paid over under its contract of lease to the creditors of its lessor incurred by the lessor for certain capital expenditures. What would have been the result in the Board and in the District Court of Appeals, if the contention had been made that the transaction was, in fact, a sale, we need not here speculate. In *Baton Coal Co., supra*, there was no option or privilege to purchase in the contract of lease which had reference to the mining of coal and by its terms remained in force until the exhaustion of the coal vein estimated to be within 10 or 12 years. These authorities and contentions of the petitioner do not convince us of error in the action of the Commissioner and he is sustained on this point.

Somewhat as an alternative contention the petitioner alleges error on the part of the Commissioner for his failure to allow depreciation an the building " in the event no amortization of leasehold is allowed." It appears the Commissioner has established the rate and value for depreciation purposes on the building referred to, and as there was no evidence offered or reason shown at the hearing for disturbing that determination of the Commissioner, we must sustain it.

*Judgment will be entered for the respondent.*