Calcasieu Paper Company, Inc. v. Commissioner.
Calcasieu Paper Co. v. Commissioner
Docket No. 33392.
United States Tax Court
1953 Tax Ct. Memo LEXIS 392; 12 T.C.M. (CCH) 74; T.C.M. (RIA) 53028; January 30, 1953
*392 In 1947, petitioner received a 10-year lease of a townsite with an option to buy during the seventh and eighth years of the lease. If the option were exercised, payments made after the sixth year of the lease were to be applied to the purchase price. Petitioner, in its 1947 income tax return, deducted the amount paid in that year under the lease as rent. Respondent disallowed the deduction on the ground that the agreement was not a lease but a sale. Held, the agreement was a lease, and the deduction as rent is allowed. Held, further, the useful life of a power plant purchased by petitioner determined. William T. Rogers, Esq., 801 Florida Nat'l Bank Bldg., Jacksonville, Fla., for the petitioner. Thomas C. Cravens, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion This case involves a deficiency in corporate income tax for the year 1947 in the sum of $8,606.52. The two issues presented for decision are: (1) was the sum of $22,500, paid by petitioner in 1947 under a lease containing an option to buy, a rental payment or did it represent a part of the purchase price of the property covered by the lease; and (2) what was the useful life of *393 a power plant purchased by petitioner in 1947. Other issues presented by the pleadings were abandoned at the hearing. Findings of Fact Petitioner is a Louisiana corporation with its principal place of business in Elizabeth, Louisiana. It is engaged in the manufacture of kraft paper. It filed its original and amended income tax returns for the taxable year 1947 with the collector of internal revenue for the district of Louisiana. Prior to June 1946, the controlling interest in the capital stock of petitioner was owned by four separate estates. In June 1946, 67 per cent of the capital stock was acquired by the Jacksonville Paper Company. Jacksonville Paper Company (hereinafter called Jacksonville) is a Florida corporation with its principal place of business in Jacksonville, Florida. Industrial Lumber Company (hereinafter called Industrial) is a Louisiana corporation with offices in Elizabeth, Louisiana. On or about May 1, 1946, Jacksonville entered into negotiations for the purchase of a controlling stock interest in petitioner. On May 4, 1946, the following memorandum of agreement between Jacksonville and William S. Bedal and George W. Lane, trustees under the will of Sarah *394 L. G. Wilson, was executed: "Alexandria, La., May 4, 1946. "This memorandum of agreement between Jacksonville Paper Co., a Florida Corp. as 1st Party (Corporation) and Wm. S. Bedal & Geo. W. Lane, Trustees u/w of Sarah L. G. Wilson as 2d parties (Trustees) is based upon the following facts: - "Corporation desires to obtain control of in excess of 66 2/3% of the outstanding capital stock of Calcasieu Paper Co. a Louisiana Corp. of Elizabeth, La. at a price which will be on the basis of $30 a share net after payment of Federal & State capital gains taxes. Trustees are willing to sell to first party all their shares of stock in Calcasieu Co. at said price but own only slightly in excess of 25,000 shares or less than 40% of said stock. To obtain the additional shares necessary Trustees will have to assemble said stock. "Corporation has delivered to Trustees its check drawn on the Barnett National Bank of Jacksonville, Fla. for $500,000 payable to the order of Miss. Valley Trust Co. of St. Louis as evidencing its good faith. Said check is to be used as follows: - "1. The check shall be deposited to the joint account of Corporation and Trustees in said Trust Co. Checks against *395 the said account shall be signed by an authorized agent of Corporation and countersigned by either one of Trustees. "2. If sale is consummated sd. sum shall be applied as part purchase price of said stock owned by Trustees. "3. If sale is not consummated said sum shall be returned to Corporation. "4. Trustees shall tender from 66 2/3% plus 1 share of said outstanding stock up to 75% on or before July 1, 1946. "5. It is understood in connection with said tender, contracts must be made covering the power house, the town site and the forests of Industrial Lumber Co. the terms of which must be agreed upon by Calc. Paper Co. & Industrial Lbr. Co. "6. It is also understood that contracts must be made between Paper Co. and C. L. Glasgow & Wm. S. Bedal for their services. "7. The terms of all contracts above mentioned must be satisfactory to Corporation otherwise it shall not be obligated to accept said tender. "8. The stock to be tendered to Corporation shall be delivered to Miss. Valley Trust Co. indorsed in blank and delivered by Trust Co. against payment of full purchase price in cash. "9. The resources of Calc. Paper Co. are substantially as reflected in its balance sheet *396 of March 31, 1946 copy of which will be furnished Corporation. "JACKSONVILLE PAPER CO. "By C. G. McGehee President. "Wm. S. Bedal, Trustee "u/w Sarah L. G. Wilson" Industrial owned large acreages of timber land adjacent to the Townsite of Elizabeth, Louisiana. It also owned the Townsite (variously referred to in the instruments quoted herein as "town site", "town properties", and "Town Site") and a power plant which provided the power necessary to operate the machinery of Calcasieu Paper Company, Inc., and to supply the Townsite with power. The offer of Jacksonville to buy a controlling interest in petitioner was conditioned upon petitioner being given, among other things, a 25-year cutting-right contract on 30,000 acres of land owned by Industrial that had been planted in timber. The offer was also conditioned upon petitioner procuring a lease from Industrial on the Townsite of Elizabeth and on the old power plant located there. Elizabeth had a population of approximately 1,400 all of whom worked either for Industrial or for petitioner. In June 1946, the transfer of stock to Jacksonville was consummated, Jacksonville paying in excess of $500,000 for it. During the taxable *397 year in controversy, Jacksonville owned approximately 75 per cent of the capital stock of petitioner. No agreement was reached at the time of the transfer of the stock to Jacksonville with respect to the Townsite, the power plant, or the cutting rights on the timber land; but it was understood that details relating thereto would be the subject of further negotiation and agreement. On December 12, 1946, William S. Bedal, in his capacity as president of Industrial, wrote petitioner a letter stating that its offer to purchase the power plant was rejected and enclosing a memorandum setting forth the terms on which Industrial was willing to lease the power plant and the Townsite as follows: "MEMORANDUM OF TERMS ON WHICH INDUSTRIAL LUMBER COMPANY IS WILLING TO LEASE THE POWER PLANT AND TOWN PROPERTIES TO CALCASIEU PAPER COMPANY "POWER PLANT "PROPERTY INCLUDED: If lease is effected for both the power plant and town properties then all property at present included in the current lease is to be included in the proposed lease. This includes right-of-way for present transmission and supply lines. If power plant lease only is accepted then power plant lease will cover only the land, buildings *398 and machinery used for the generation and distribution of electricity and the supplying of water together with the necessary rights-of-way for transmission and supply lines. All other land, buildings and machinery will be excluded. "TERM: Four years, commencing January 1, 1947. "RENTAL: Same as at present, that is $39,600 a year payable in monthly installments of $3,300 in advance. "OTHER TERMS: Calcasieu shall on demand reimburse Industrial for insurance premiums paid for insurance, the coverage to be the same as at present. Calcasieu shall on demand reimburse Industrial for taxes paid on leased property. Calcasieu shall, at its own expense, maintain the leased property in operating condition and surrender the same at the termination of the lease in as good condition as received, wear and tear alone excepted. The cost of all turbine replacements must be absorbed by Calcasieu. Industrial shall be put to no expense whatever in connection with the power plant. "Calcasieu shall furnish electric service and water to all residents of Elizabeth, likewise for all commercial properties. It must furnish free electric service for the street lights and free electricity and water for Industrial's *399 main office, the hospital, the pavilion and the two negro churches. "Calcasieu shall also furnish gas to all premises where same is now being furnished. "Industrial shall be represented on the Board of Directors of Calcasieu by one director named by Industrial Lumber Company. The making of a lease on the power plant is contingent on the Calcasieu Paper Company reimbursing Industrial for insurance premiums advanced by Industrial and on the payment of which Calcasieu Paper Company is now in default and likewise on condition that Calcasieu acknowledges Industrial has in all respects complied with the current power plant lease and that Calcasieu has no claim of any kind against Industrial on account of the current power plant lease. "TOWN PROPERTIES "PROPERTY COVERED: Residences and commercial properties south of the Santa Fe railroad track and two residences and a beer parlor north thereof as under present lease, excepting therefrom the residences now occupied by Messrs. Glasgow, Ben F. Smith and Hollingsworth, also excepting the main office of Industrial Lumber Company and Elizabeth Hospital. If Industrial should need a dwelling for any employee in addition to Mr. Hollingsworth *400 Industrial is to have the right to select a suitable dwelling for such employee and except the dwelling from the lease, the rental of Calcasieu being reduced proportionately. "TERM: Two years, commencing January 1, 1947. "RENTAL: $40,000 a year payable in monthly installments of $3,333.33 in advance. Out of this rental so paid Industrial will reimburse Calcasieu to the extent of $20,000 a year for all repairs made by Calcasieu to keep the houses and commercial properties in Elizabeth as a whole in habitable and usable condition, all repairs to be made by Calcasieu. Reimbursement to the extent of $20,000 is to be made by Industrial upon presentation of itemized statement showing expenditures. In addition, Industrial will match up to $5,000 every dollar in addition to $20,000 expended by Calcasieu in the above maintenance or in making additions, alternations and structural changes agreed to by both parties. "OTHER TERMS: Calcasieu shall on demand reimburse Industrial for insurance premiums paid for the same insurance coverage as at present; also reimburse Industrial on demand for taxes paid on the town properties. Calcasieu must continue the same services for the town as it does *401 at present at its own expense, that is keeping drains open, oiling streets, watering streets, cutting weeds, maintaining the street electric lines and maintaining the streets and sewer system as well as the scavenger service. "If the power plant lease is not effected such buildings as are now on power plant site used in connection with the town will be included in the town lease without additional compensation. "In considering what are repairs those matters simply will be considered as repairs which are necessary to keep the leased property as a whole in habitable and usable condition. It will not be considered a repair where a building needs alternations, additions, structural changes and complete rehabilitation to put it in usable condition. For such purpose Calcasieu will have to expend its own funds except to the extent of the $5,000 matching as above provided. It is the intent that at least $20,000 a year be spent by Calcasieu on the leased properties as a whole and no substantial sum be spent on any one building except by agreement of the parties and under the $5,000 matching provision. "Calcasieu shall at the request of Industrial make repairs on the reserved dwellings *402 at cost to Calcasieu. It shall also keep the hospital in a good condition of repair. "Industrial, as a condition of the lease, must be represented on the Board of Directors of the Calcasieu Paper Company by one director named by Industrial Lumber Company. "The lease will be subject to all servitudes, restrictions, encumbrances of any kind now existing on the lands, whether of record or not. "It will be a condition of the lease that Calcasieu agrees it has no claim of any kind against Industrial on the present lease of the town properties. "It will be understood in the lease of the power plant or of the town properties, or both, or either, that all property of Industrial not covered by lease to Calcasieu Paper Company is to remain in place with right of ingress and egress to Industrial, its employees and others; that Industrial shall have the right of access to the rented properties; that the books and records of Calcasieu relating to any matter connected with the leases or either of them or relating thereto be open to inspection by Industrial. "In making this offer for the lease of the town properties the Directors have considered that present rentals should be raised a minimum *403 of 30 per cent; that a charge should be made for water and that the scavenging charge at present included in rent is far too low." On January 4, 1947, petitioner's attorney sent the following letter to Industrial: "Industrial Lumber Company, Inc., Elizabeth, Louisiana. "Attention: Mr. William S. Bedal, President "Gentlemen: - "On behalf of my client, Jacksonville Paper Company, Jacksonville, Florida, I am writing you in reference to your contract with the Jacksonville Paper Company, dated May 4, 1946, further evidenced by Memorandum dated May 18, 1946, and oral discussions attendant thereto. "In accordance with said contract, my client, Jacksonville Paper Company, hereby avails itself of its following agreements: "1. To purchase the Power Plant at Elizabeth, Louisiana, servicing Paper Company and the Town of Elizabeth, at a fair appraisal value, which you have been advised amounts to $89,985.00; "2. The purchase of cutting rights on the reforested areas of Industrial Lumber Company, estimated at 30,000 acres, both natural and hand-planted, at the rate of 10" an acre, annually in advance; and "3. The lease and operation of the Town Site of Elizabeth. "For the lease *404 and operation of the Town Site, my client, Jacksonville Paper Company, has already paid you on a basis of $1,000.00 per month, the last payment covering the period through January 31, 1947. "Incidentally, my client has complied with its agreement to pay Mr. William S. Bedal, your President, his annual retainer of $5,000.00, and to Mr. C. L. Glasgow, Past President of Calcasieu Paper Company, $500.00 per month. "Having complied with all of its obligations under the contract and being ready and willing to proceed with the phases thereof, which have not been closed to date, my client hereby tenders to you in payment of the Power Plant and in payment of the cutting rights for 1947, a Cashier's Check drawn on The Calcasieu-Marine National Bank, Oakdale Branch, in the sum of $92,985.00, and requests that the proper deeds and instruments be executed to it within a reasonable time covering the sale of the Power Plant, the cutting rights and the rental of the Town Site. "Mr. C. G. McGehee is in my office at the time of the dictation of this letter to evidence my authority in the premises. "Your very truly, "/S/ LeDoux R. Provosty "/S/ C. G. McGehee C. G. McGehee LRP:m" On *405 January 23, 1947, Jacksonville brought suit in the United States District Court for the Western District of Louisiana against Industrial seeking specific performance of the memorandum of agreement of May 4, 1946. Specifically, Jacksonville demanded judgment requiring Industrial to sell the power plant to Jacksonville for the sum of $89,985 and to rent to Jacksonville the Townsite of Elizabeth at a rental of $1,000 per month. The case went to trial and, after about three days of trial, it was settled. As a result of the settlement, petitioner purchased the power plant for the sum of $199,784.72 and obtained a 10-year lease on the Townsite, reading, in part, as follows: "ELIZABETH TOWN SITE CONTRACT "STATE OF LOUISIANA
"PARISH OF RAPIDES "BE IT KNOWN, That on this 18 day of April, 1947, before me Richard B. Sadler, Jr., a Notary Public, duly commissioned and qualified in and for the Parish and State aforesaid, and in the presence of the hereinafter named and undersigned competent witnesses came and appeared INDUSTRIAL LUMBER COMPANY, INC., (hereinafter sometimes referred to as 'Industrial') a Louisiana Corporation domiciled in Allen Parish, Louisiana, herein represented by Wm. *406 S. Bedal, its President, duly authorized by resolution of the Board of Directors of said corporation dated April 18, 1947, and CALCASIEU PAPER COMPANY, INC., (hereinafter sometimes referred to as 'Calcasieu') a Louisiana Corporation, domiciled in Allen Parish, Louisiana, herein represented by C. G. McGehee, its President, duly authorized by resolution of the Board of Directors of said corporation, each of which declared and acknowledged unto me, Notary, through its respective representative that: "For the considerations and rentals and upon the terms and conditions hereinafter set out, 'Industrial' and 'Calcasieu' have and do by these presents enter into the following agreement and contract of lease and hiring, the 'Industrial' hereby does lease, let and hire unto 'Calcasieu' and 'Calcasieu' agrees to rent and take, to have and to hold the same for a period of ten (10) years from April 15, 1947, the same property herein leased being more fully described as follows, to-wit: * * *
[Description of the property.] "LESS FOLLOWING DESIGNATED PROPERTY which is excluded from this lease: * * *
[Description of the property.] "I. This lease and contract also includes all *407 rights and servitudes the Industrial Lumber Company, Inc., owns on, over and across the right of way of the Jasper and Eastern Railroad, and any buildings, water lines, gas lines and electric lines owned by the Industrial Lumber Company, Inc., which are located on or across said right of way of Jasper and Eastern Railroad and which are included within the lines marked "Blue" shown on said attached plat and which railroad property and rights of way, it is understood and agreed are not owned or controlled by the Industrial Lumber Company, Inc.
"II. The said 'Calcasieu', in consideration of the lease of said property agrees to rent and lease said property and to pay the said 'Industrial' an annual rental of Thirty Thousand and No/100 ($30,000.00) Dollars each year during the term of this lease, which rentals are payable in equal quarterly installments of Seven Thousand Five Hundred and No/100 ($7,500.00) Dollars each in advance, the first quarterly annual installment to be paid on the execution of this lease and a like sum to be paid on the first day of each succeeding three (3) months period thereafter; said rentals are to be payable at the office of the 'Industrial' in Elizabeth, *408 Louisiana, or at such place as may, from time to time, be designated by written notice to 'Lessee'. "III. Any and all unpaid installments or rentals for this lease shall bear interest at the rate of five (5%) per cent per annum from maturity until paid; and also five (5%) per cent attorneys' fees on the amount to be collected in the event of default by said 'Lessee' and the placing of the claim in the hands of an attorney for collection; it is further agreed that if the 'Lessee' fails to pay any quarterly installment rentals, when due, or defaults in the performance of any other covenant or condition of this lease, at the option of the 'Lessor', or its successors or assigns, all unmatured rent shall become due and exigible, if the 'Lessee' fails to liquidate the amount delinquent or to perform such other covenants within ten (10) days after written demand therefor, and that on the happening of any of those events, 'Lessor' shall, 'ipsofacto', have the right to re-enter and repossess the leased premises. "IV. 'Lessee' further agrees and obligates itself to furnish or have furnished all utilities, including gas, water, electricity, sewers, scavenger service, street lighting and other *409 similar public service, now or formerly furnished to or used for the benefits of the 'Town Site' of Elizabeth, Louisiana, and of the general public in or on the lease 'Town Site' premises, and likewise agrees to maintain the streets, walks, sewers, water mains and gas mains, electric power, and other service facilities in suitable condition for the purposes for which they were constituted. 'Calcasieu's' obligations under this paragraph shall cease if and when 'Calcasieu' discontinues the operation of utilities. "V. It is further agreed and understood that 'Lessee' shall, during the term of this lease, and beginning with the year 1947, pay all taxes, assessments, and levies assessed or levied against and on the leased property. "VI. It is further agreed that 'Lessee' shall carry all insurance and pay all insurance premiums on said property, and that 'Lessor' may require that 'Lessee' during the term of this lease take out fire, tornado and extended coverage insurance policies to protect 'Lessor' against loss by fire, windstorm and other hazards usually covered by such policies, in the sum equivalent to ninety (90%) per cent of its sound insurabel [insurance] value provided that *410 'Lessee' is to be required to pay premiums on such insurance of not more than $425,000.00; and that in the event of loss due to such hazards such insurance monies is to be payable to 'Lessor' and 'Lessee' to be used to repair the damaged premises, and to be applied only to the payment of actual bills if and when incurred in that connection. "It is further agreed that the said 'Lessee' shall carry plate glass insurance against loss by breakage and other hazards to any plate glass now a part of any buildings on said town site. "VII. 'Lessee' shall also take out an insurance policy indemnifying 'Lessor' against its liability under the law to tenants and to the public by reason of 'Lessor's' ownership of the leased property with not less than $50,000.00 and $100,000.00 limits to be so carried. "VIII. It is further agreed that the 'Lessee' assumes all liability imposed by law upon or against the 'Lessor' for any claims which may be made against 'Lessor' by tenants, sub-tenants or other persons, by reason of the ownership of said property by 'Lessor', and to save 'Lessor' harmless from liability and damage against all such claims, including claims for damages or injuries resulting *411 from vices or latent and apparent defects in or on the buildings and improvements located in said town sites. "IX. 'Lessor' hereby sells and transfers to 'Lessee' the right and option to purchase the property, both immovable and movable, herein leased, at any time between April 15, 1953 and April 15, 1955, for the sum of One Hundred and Twenty Thousand and No/100 ($120,000.00) Dollars cash. All rentals paid by 'Lessee' for rent accruing between April 15, 1953 and the date of consummation of the sale shall be credited on the purchase price. 'Lessee' shall give 'Lessor' sixty (60) days notice in writing of its intention to exercise this option. On receipt of said notice 'Lessor', within Thirty (30) days thereafter, shall deliver to 'Lessee' any abstracts of title for the leased premises in its possession and said abstracts shall be continued or brought up to date at 'Lessee's' expense. Said sale shall be closed, promptly after the abstracts have been completed, at the office of 'Lessor' at Elizabeth, Louisiana, and on payment to 'Lessor' of the purchase price 'Lessor' shall deliver to 'Lessee' a warranty deed to said property free from encumbrances, but excepting from said warranty *412 all taxes, all servitudes affecting said property subsequent to April 15, 1947, which were granted with the consent of 'Lessee', and also excepting any servitudes obtained by public user which may have existed at the date of this lease or have arisen subsequently; provided this option shall not be enforceable if 'Lessee' is in default in any rental payment. "'Industrial' agrees not to grant any oil or gas mineral leases on town site while this lease is effective. "X. As a part of the consideration of this lease, 'Lessee' agrees to furnish to the improved premises owned by 'Lessor' and not leased hereunder, as well as to the occupants thereof, all public utility and other services which 'Lessee' may furnish or cause to be furnished to the leased premises and the occupants thereof, and on the same terms and conditions, not only during the term of this lease but after the termination thereof, so long as 'Lessee' or its assigns continue to operate said utilities in Allen Parish, Louisiana. 'Lessee' also agrees to likewise furnish said services to any properties which 'Lessor' may hereafter improve, provided the cost of connecting said property or properties into then existing service *413 lines, mains, pipes, or otherwise of 'Lessee' is paid for by 'Lessor', and 'Lessee' is able to furnish said additional service without making additions to its present or then existing facilities therefor, 'Lessor' to pay for all material necessary for such connection. "XI. As a further consideration for this lease, 'Lessee' agrees to make the necessary repairs to busildings and improvements and the furniture and fixtures and movable contents in the hotel and other leased buildings, and to keep fire apparatus and all other movable and immovable property described in this lease, in reasonably good repair as a prudent owner administrator would do with similar property in his possession. Likewise, 'Lessee' agrees to return said leased property to the 'Lessor' in such reasonably good repair at the termination of this lease, and to replace any movable property, including furnishings contained in said buildings at the time of the execution of this lease, which may be lost or destroyed due to carelessness, negligence or improper use on the part of 'Lessee' or its agents and employees, to the end that said buildings and contents thereof may be returned to 'Lessor' in reasonably good repair *414 and usable condition on the termination of this lease, ordinary wear and tear excepted. "XII. This contract is made subsequent to and supersedes a tentative agreement of March 20, 1947, by and between C. G. McGehee, Tillman Cavert, Arend V. Dubee, and Donald W. Cragin, individually and as Directors and/or stockholders of Calcasieu Paper Company, Inc., on the one part, and Wm. S. Bedal, George W. Lane, Arend V. Dubee, Donald W. Cragin, H. Bascom Funchess, Jr., and C. L. Glasgow, individually and as Directors and/or stockholders of Industrial Lumber Company, Inc., on the other part. This contract embodies the entire agreement on the subject matter herein contained between the parties, having been prepared after full discussion shall be construed neither for or against 'Calcasieu' or 'Industrial'. "This contract is binding on the successors and assigns of both parties hereto. "This done, read and signed by me at my Notarial Office in Alexandria, Louisiana, in the presence of Richard A. Anderson and Donald W. Cragin lawful witnesses, who hereunto sign with said parties and me, Notary Public, on this 18 day of April, 1947. "ATTEST: (signed) Richard A. Anderson (signed) Donald *415 Wilson Cragin "INDUSTRIAL LUMBER COMPANY, INC.
"By: Wm. S. Bedal President "CALCASIEU PAPER COMPANY, INC. "By: C. G. McGehee President "BEFORE ME Richard B. Sadler, Jr. Notary Public "(SEAL)" The option to purchase, contained in the lease, was inserted at the request of the petitioner because it wanted to control the Townsite without further negotiations with Industrial, if petitioner later decided to expand the paper mill. The $30,000-a-year rental under the lease was considered by the president of petitioner to be excessive. Prior to the settlement of the suit for specific performance, petitioner had been paying an annual rental on the Townsite not in excess of $12,000 a year. Petitioner's president anticipated that the annual income to petitioner from the rental of the individual units in the Townsite to the employees of petitioner would be from $5,000 to $7,000 per year less than the annual outlay by petitioner in connection with the property. This estimate has proven to be approximately correct. The total value of the Townsite in 1947 did not exceed $120,000. In its income tax return for 1947, the petitioner claimed the payments made under the aforementioned *416 lease as rental deductions. The respondent determined that the lease agreement was, in effect, a purchase and sale agreement, and disallowed the rental deductions. The power plant purchased by petitioner as a result of the settlement of the suit for specific performance was 40 years old in 1947. After Jacksonville bought a controlling interest in petitioner, its capacity was increased substantially. The old power plant was not capable of carrying the increased load and petitioner had to build a new power plant, costing $600,000, which was completed and put in operation in August or September 1950. Since that time the old plant has been used by petitioner as an emergency source of power and was still so used at the time this proceeding was heard in 1952. When it was necessary to inspect or repair the turbines in the new power plant, the turbines in the old power plant were used as a source of power. At times the new turbines were out of operation for as long as two weeks and this occurred from three to five times a year. Such emergency use of the old power plant was not satisfactory and petitioner had plans to spend an additional $250,000 for increased power. In its income tax return *417 for 1947, petitioner claimed depreciation on the old power plant computed on an estimated useful life of four years. The respondent determined that it had a useful life of 10 years. The useful life of the old power plant in 1947 was 10 years. Opinion RICE, Judge: The first issue presents the now familiar problem whether a lease with an option to buy real property, under an arrangement where a part of the lease payments may be applied to the purchase price when the option is exercised, is a lease in fact or a sale. If a lease, the amounts paid are rental payments and are deductible in full in the year paid. [1] If a sale, the amounts paid must be capitalized and recovered through depreciation. [2]
*418 Respondent argues that the so-called rental payment was not a proper deduction since, under the agreement in controversy, petitioner acquired title to or was acquiring title or an equity in the Townsite, and that it clearly appears from the record that the so-called lease was nothing more than a sales agreement and payments thereunder were, therefore, not deductible. In support thereof, he cites Chicago Stoker Corporation, 14 T.C. 441 (1950); Truman Bowen, 12 T.C. 446 (1949); Judson Mills, 11 T.C. 25 (1948); Robert A. Taft, 27 B.T.A. 808 (1933); Holeproof Hosiery Co., 11 B.T.A. 547 (1928). He argues further that under the holding in Helser Machine & Marine Works, Inc., 39 B.T.A. 644 (1939), petitioner is precluded from claiming the deduction because, under the agreement, it had a right to take title. The record shows that it was necessary for petitioner to have the use of the Townsite to house its employees because there were no other housing facilities in the neighborhood. Petitioner's president testified that the offer to buy control of petitioner was conditioned, among other things, upon petitioner *419 getting a lease on the Townsite. He also testified that no offer at any time was made to buy the Townsite, nor was any offer ever made to sell it. His attorney, who attended some of the meetings during which the negotiations were held, also testified to the same effect. The suit for specific performance corroborates the testimony on this point because one of the specific demands for relief in that suit was for a lease of the Townsite at a rental of $1,000 per month. When the suit was settled, petitioner received the lease, in controversy here, at a rental of $30,000 a year for 10 years. Petitioner insisted it be given an option to buy the Townsite in order to protect itself at a later date if the capacity of the paper mill were expanded. The option which was granted could be exercised only during the two-year period commencing April 15, 1953, and ending April 15, 1955; and, if it were exercised, only the rentals paid after April 15, 1953 to the date of the consummation of the sale could be credited to the agreed purchase price of $120,000. We have found as a fact that the property was not worth more than $120,000, the option price, and the rental payments for the last four years *420 of the lease amounted to exactly that figure. It cannot, therefore, be said that the payments in 1947 created an equity in the property in petitioner's favor. There is some evidence in the record that the value of the Townsite was considerably less than $120,000, but we do not need to set a precise valuation on the property because, if the value of the property does not equal or is less than the option price, the payments in 1947, which are not to be credited on the purchase price under any circumstances, could create no equityin the property. See Estate of Clarence B. Eaton, 10 T.C. 869 (1948); and Gilken Corporation, 10 T.C. 445 (1948), affd. 176 Fed. (2d) 141 (C.A. 6, 1949); and cf. Chicago Stoker Corporation, supra. The cases cited by respondent, except Helser Machine & Marine Works, Inc., supra, are cases holding that the agreements in controversy were not leases but sales agreements and that the payments created an equity in the payer. They are, therefore, distinguishable from this case. In Helser Machine & Marine Works, Inc., the taxpayer agreed to pay "rent" for 10 years and the lessors gave it an option *421 to purchase the premises at any time during the term of the lease, the rental payments to apply as payments on the purchase price. The lessors also agreed that whenever the lessee had paid the full sum of $19,200 prior to May 1, 1945, they would deed the property to the lessee. We held in that case that since the taxpayer had a right to take title to the property at any time during the term of the lease when the total sum due for the 10-year lease had been paid, that the monthly payments made in 1935 were not deductible as rental. That case also is distinguishable from this one. It seems sufficient to point out that here there was no right in petitioner to exercise the option during the taxable year in question. By way of summary, this record shows that (1) the value of the Townsite was not in excess of $120,000, the option price; (2) only payments made after April 15, 1953, were to be applied to the purchase price under the option; (3) the amount required to be paid upon exercise of the option ($120,000) amounted to 40 per cent of the total payments to be made under the lease ($300,000); (4) the option could not be exercised at any time, but only after a period of six years; (5) *422 the term of the lease was 10 years, not a few months or a few years; and (6) the intent of the parties was to make a lease. We, therefore, decide this issue for the petitioner. With respect to the second issue, the record leaves something to be desired. The power plant was 40 years old when purchased by the petitioner in 1947. The capacity of petitioner to manufacture paper was increased substantially, and the old power plant was unable to carry the increased load. Petitioner built a new power plant which was completed and put in operation in August or September 1950 and, at the time of the hearing, had plans to expand it because the emergency use of the old plant had not been satisfactory. If the old power plant had been dismantled or abandoned at that time, petitioner's rate of depreciation could probably be sustained. However, the old plant was still in use as a source of emergency power at the time this proceeding was heard in 1952, a period of approximately five years after its purchase. Petitioner's president testified that plans had been made to spend an additional $250,000 for power, so we must assume some continued use of the old plant until such plans were executed. On *423 the basis of the entire record, we conclude that petitioner has failed to sustain its burden of proof that the 10-year life determined by the respondent was erroneous, and, on this issue, we hold for respondent. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpaper has not taken or is not taking title or in which he has no equity. * * *↩
2. (1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, * * *↩