Franklin Leon Alexander et al. [1] v. Commissioner. Alexander v. Commissioner
Docket Nos. 57321, 57322, 61025, 61026.
United States Tax Court
T.C. Memo 1958-43; 1958 Tax Ct. Memo LEXIS 186; 17 T.C.M. (CCH) 221; T.C.M. (RIA) 58043; March 19, 1958
*186 Amounts received by petitioners under a lease-option agreement held not to constitute rentals, but were receipts under a contract for sale of property. Sylvan Tobolowsky, Esq., Southwestern Life Building, Dallas, Tex., for the petitioners. Roy E. Graham, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: These proceedings involve deficiencies in income tax for the years and in the amounts as follows: Dkt. No.
Year
Deficiency
57321
1951
$ 349.60
57322
1951
319.60
61025
1952
3,460.03
61026
1952
3,208.02 The proceedings were consolidated for hearing. The only issue presented for decision is whether amounts received by the petitioners under a lease-option agreement were rentals and properly taxable as ordinary income, as determined by the respondent, or whether they represented receipts from the sale of a ranch, as contended by the petitioners. Findings of Fact Some of the facts were stipulated and as so stipulated are incorporated herein. The petitioners are husband and wife. They reside at Hereford, Texas, and filed separate income tax returns for the years 1951 and 1952 with the collector *187 at Dallas, Texas. They reported their income on the cash receipts and disbursements method and the calendar year basis. In December 1949 the petitioners acquired, as community property, a tract of land in Deaf Smith County, Texas, which consisted of 649.2 acres. The tract is located 5 miles west and 1 mile south of Hereford, Texas. The petitioners acquired the tract for a consideration of $68,029.50 of which they paid $13,239.50 in cash and gave a note for $54,790, secured by mortgage, payable in twenty annual installments with interest at 4 1/2 percent. The cost to the petitioners was approximately $105 per acre. At the time of purchase of the tract 403 acres thereof were under cultivation. Improvements at that time consisted of one 8 inch equipped irrigation well, a house, windmill and storage tank, barns and fencing. In the years 1950 and 1951 the petitioners installed another 8 inch equipped irrigation well, and made other improvements, at a total cost of $4,097.01. On October 25, 1951, the adjusted basis of the tract, including improvements, in the hands of the petitioners was $70,110.43. In the year 1950 the petitioner Alexander farmed the tract, but did not make a successful *188 crop. He borrowed money to meet the December 1950 installment of mortgage principal and interest. In 1951 the tract was leased to a tenant on a crop-share basis. In 1951 additional acreage was placed in cultivation. At October 25, 1951, there were 452 acres which were under cultivation; the balance was pasture land. In 1950 and 1951 the petitioners attempted to sell the tract. They listed it for sale with real estate dealers, ran some advertisements, and got in touch with persons who were interested in purchasing land. In 1950 the tract was listed for sale at a price of $200 per acre for the entire tract. In 1951 they offered the property at a price of $250 per acre for the half section (320 acres) on which were located the irrigation wells but not the other improvements, or at $225 per acre for the entire tract. By 1951 there had been some increases in land prices in that area due to the Korean war situation. In October 1951 petitioner Alexander got in touch with Charles E. Huston, who at that time was engaged in packing and shipping vegetables at Hereford. Huston was also or had been engaged in the business of raising vegetables in California, Arizona, and the Rio Grande Valley *189 of Texas. In 1950 Huston found land prices favorable in the vicinity of Hereford and decided to buy some land, for the purpose of growing vegetables. He did buy some land in 1951 and farmed it the following year. On or about October 25, 1951, he purchased a tract of land known as the Benefield property, which adjoined the Alexander tract on the north for a cash consideration $200of per acre. This property consisted of about 647 acres. About that time he also undertook to buy the Keeton ranch consisting of 640 acres and located about 9 miles northeast of the town of Hereford for $238.50 per acre, or $152,000. Alexander offered to sell Huston a half section of his tract, which contained the irrigation wells, at a price of $250 per acre. However, Huston was not interested in acquiring merely a part of Alexander's tract, but was interested in purchasing the whole tract if he could get it at a price of $175 per acre, in order to operate it in conjunction with the Benefield tract. At that time Huston was not in a financial position to purchase the tract outright because of his other purchases. He, therefore, suggested an arrangement in the form of a lease for two years with an option to *190 purchase at the end of such term, with the privilege of applying the rental on the purchase price in the event he exercised the option. The petitioner Alexander finally offered to sell for a lump sum which would amount to about $210 per acre, and the parties proceeded to the office of the petitioner's attorney where certain calculations were made based upon installment payments, with interest at 4 1/2 percent on the unpaid balance. There was no discussion between Alexander and Huston of the rental value of the land. This culminated in the execution, on October 25, 1951, by Alexander and Huston, of an agreement wherein Alexander was called the "lessor" and Huston was called the "lessee," and which, omitting formal parts, provided as follows: "Lessor hereby agrees to lease unto Lessee the following described property: * * *
"The lease term shall commence on January 1, 1952, and shall end on December 31, 1953. "The rental for said two years shall be $60,350.00, payable as hereinafter provided. "The rental for the first year of the said lease term shall amount to $25,350.00, and is payable as follows: (a) $11,350.00 this day paid in cash by Lessee to Lessor, the receipt *191 of which is hereby acknowledged; and (b) $14,000.00 to be paid in cash by Lessee to Lessor on February 25, 1952. "The rental for the second year of the said lease term shall amount to $35,000.00, and is payable as follows: (a) $21,000.00 to be paid in cash by Lessee to Lessor on November 25, 1952; and (b) $14,000.00 to be paid in cash by Lessee to Lessor on February 25, 1953. "Failure by the Lessee to pay any rental payment as above provided, shall immediately terminate this lease, and Lessor shall have the immediate right of reentry. The said cash rental payment of $11,350.00 made this date, nor the said cash rental payment of $21,000.00 to be made preceding the second year term, shall not entitle Lessee to claim a refund from Lessor of said payments in event of a subsequent default, nor to claim a paid up lease for part of the term. In event of termination of this lease by default of any such rental payment, all improvements made by Lessee and growing crops on said premises shall become the property of Lessor. "Lessee is hereby given the option to purchase the above described property as follows: (a) On November 30, 1952, for a cash consideration of $88,450.80; provided *192 prior to such respective dates, Lessee be current in his payment of the rental as agreed to above. In event of the exercise of such option, Lessee shall not be entitled to claim from Lessor any refund for rental paid theretofore, and Lessor agrees to convey said property by General Warranty Deed, reserving unto himself, his heirs and assigns, an undivided one half royalty interest, non-participating, as to said land, and said conveyance to be subject to any oil, gas and minerals lease and all right of ways and easements relating to said property, of record and in full force and effect." Upon execution of the above agreement Huston entered into possession of the Alexander tract and commenced farming operations. In 1952 he installed an additional irrigation well and pump, built some railroad tie bridges, leveled ground, and made improvements on the dwelling, including the addition of a concrete porch, all at a cost of $8,000 to $9,000. In accordance with the terms of the October 1951 contract Huston made payments to the petitioners as follows: October 25, 1951
$11,350
February 25, 1952
14,000
November 25, 1952
21,000
February 25, 1953
14,000
During the years *193 1951 and 1952 the Alexander tract was subject to a mineral lease, and the delay rentals thereunder were collected by Alexander. The amounts of such rentals were approximately equal to the real estate taxes on the tract, which taxes were paid by Alexander. Alexander carried insurance on the house on the tract in those years, and Huston carried insurance on the other buildings. Alexander made payments of principal on the mortgage on the property in the years 1952 and 1953. In September or October 1953, Huston advised Alexander that he would not be able to pay the amount of $88,450.80 that was due to be paid on November 25, 1953, in order to permit Huston to exercise the "option to purchase" under the agreement of October 25, 1951. He inquired of Alexander whether Alexander would refund the amounts that had so far been paid, aggregating $60,350, and take back the land. Alexander told Huston he would like to have it back but could not afford it. Thereupon Huston and Alexander worked out a new arrangement which was reduced to writing under date of November 25, 1953. That agreement, omitting formal parts and description of land, provided as follows: "WHEREAS, by Agreement between said *194 parties, dated October 25, 1951, Buyer was given the option to purchase the following described property for a cash consideration of $88,450.80, and Buyer has exercised said option and Seller has agreed to sell said property on the terms and conditions hereinafter set forth: "Seller agrees to sell and Buyer agrees to buy the following described property: * * *
"Seller agrees to take and Buyer agrees to buy said property for a total principal consideration of $88,450.80, payable as follows: $12,730.80 payable on or before December 26, 1953, and to be deposited to Seller's account with The First National Bank of Hereford, Texas; $12,730.00 payable on or before November 25, 1954, and to be deposited in similar manner; $12,730.00 payable on or before November 25, 1955, and to be deposited in like manner; $11,907.00 payable on or before November 25, 1956, and deposited as above provided; and $38,353.00 represented by the assumption and agreement to pay that amount of principal on the Sam and Eliza Wilson secured indebtedness hereinafter mentioned; and Buyer further agrees to pay interest at the rate of five per cent (5%) per annum from date on the unpaid balance of *195 said principal consideration of $88,450.80, said interest being first payable on November 25, 1954, and annually thereafter, until the first four of said principal installments have been [paid] in full. "When the first four of said principal installments have been paid, together with the interest as above provided, then Seller agrees to convey said property to Buyer by General Warranty Deed wherein Seller shall be joined by his wife, which deed will provide for an unpaid balance of $38,353.00 to be assumed by Buyer on the Sam and Eliza Wilson secured indebtedness now against said property and the retention of a Vendor's Lien in said deed to secure said indebtedness, also said deed to except and reserve unto Seller, his heirs and assigns, of an 1/16th non-participating royalty interest (same being 1/2 of the usual 1/8th royalty), as to said land, and said deed to be subject to any oil, gas and minerals lease against said property and all right of ways and easements of record and in full force and effect; all conditioned on Buyer fully performing all of the provisions of this Agreement. "Buyer agrees to pay Sam and Eliza Wilson on or before December 29, 1953, the sum of $2,095.72, *196 their address being 131 Avenue E, Hereford, Texas. "Buyer further agrees to pay all ad valorem taxes against said property during the life of this Agreement and including the year of 1953; and Buyer further agrees to carry comprehensive insurance on the main dwelling located on said property for at least the sum of $7,000.00, with a loss payable clause in favor of Seller. "Buyer also agrees that he will secure a subordination of the said Sam and Eliza Wilson indebtedness and lien to the said non-participating royalty interest to be reserved by Seller in the said deed of conveyance, such subordination to be by written instrument, duly executed and acknowledged. "Seller agrees during the existence of this Agreement to pay over to Buyer all delay rentals received by him from the existing oil, gas and minerals lease against said land, together with all bonuses and delay rentals received under any other such leases and covering said land." The agreement of November 25, 1953, was carried out and title to the land was conveyed to Huston on November 25, 1956. In 1956 Huston sold the property for about $90,000. The above-referred to Benefield property which Huston purchased in 1951 *197 at $200 per acre was about the same size as the Alexander property, but contained better improvements and approximately 100 more acres in cultivation. The above-referred to Keeton ranch which Huston undertook to purchase in 1951 at a price of $238.50 per acre also had better improvements than the Alexander property. In 1951, at or about the time Huston entered into the transaction in question with the petitioner, Huston also entered into two other similar lease-option arrangements on property in the Hereford area. One involved the Goetsch ranch of 640 acres. The other involved the Scott ranch of 497 acres, which was located about 11 miles from the Alexander property. He exercised the option with regard to the Goetsch ranch, but did not exercise the option on the Scott ranch. The petitioner Alexander was advised by his accountants that the sum of $11,350 received from Huston in 1951 should be reported on his income tax return as proceeds from the sale of property. The accounts also advised the petitioner that any error that might be made in reporting the receipt of the $11,350 could be corrected by a timely amended return. Alexander instructed the accountants to prepare his 1951 *198 income tax return and that of his wife so as to report the $11,350 as ordinary income. That amount was listed in the returns of the petitioners on the schedule of farm income and expenses attached to each return, as a lease payment. In amended returns filed in December 1952 the petitioners reported the $11,350 received from Huston as proceeds from the sale of land and computed gain on the installment basis. In their separate income tax returns for the calendar year 1952 the petitioners reported the sum of $35,000 received in that year from Huston as proceeds from the sale of real estate and computed the gain on the installment basis. In determining the deficiencies for the years 1951 and 1952 the respondent treated the amounts of $11,350 and $35,000 received by the petitioners from Huston in those respective years as ordinary income received under a lease agreement and included one-half thereof in the income of each of the petitioners. On October 25, 1951, the property in question had a value of at least $200 per acre. It was the intention of the parties to the contract of October 25, 1951, that the "rental" payments provided for therein should constitute payments to be applied *199 toward the purchase of the property, and in fact they were payments for such purpose. Opinion The question presented is whether the amounts of $11,350 and $35,000 received by the petitioners from Charles E. Huston in the years 1951 and 1952, respectively, under the lease-option contract constituted rentals or proceeds from the sale of property. If rentals, the amounts are taxable as ordinary income as determined by the respondent; if proceeds from the sale of land, they are taxable as long-term capital gain, as contended by the petitioners. We have heretofore considered a number of cases involving lease-option arrangements and the tax consequences to one or the other or both parties thereto, although generally the question has arisen in cases in which deductions for rent were claimed. [2] It has been our view that the essential nature of a transaction is not necessarily controlled by the form or by the use of the terms "lease" and "rent." Alexander W. Smith, Jr., Executor, 20 B.T.A. 27, Robert A. Taft, 27 B.T.A. 808, Truman Bowen, 12 T.C. 446, D. M. Haggard, 24 T.C. 1124, affd. Haggard v. Commissioner (C.A. 9), 241 Fed. (2d) 288, *200 and Ersel H. Beus, 28 T.C. 1133 (now on appeal C.A. 9). In the Haggard case we stated: "* * * The precise problem posed of characterizing a payment made pursuant to a lease-option arrangement has been before this Court on numerous occasions, and regardless of the form or nomenclature of the transaction, we have treated similar 'rental' payments as partial payments of the purchase price of the property involved, if by virtue of the payment the taxpayer has acquired, or will acquire title to or an equity in the property. Alexander W. Smith, Jr., Executor, 20 B.T.A. 27 (1930); Chicago Stoker Corporation, 14 T.C. 441 (1950). The principle extending throughout the cases heretofore decided by us on like issues is that where the 'lessee' as a result of the 'rental' payment, acquires something of value in relation to the over-all transaction, other than the mere use of the property, he is building up an equity in the property, and the payments do not, therefore, come within the definition of rent in section 23(a)(1)(A), supra. Judson Mills, 11 T.C. 25 (1948); Truman Bowen, 12 T.C. 446 (1949). "* * * To properly discern *201 the true character of the payment, therefore, it is necessary to ascertain the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances existing at the time the agreement was executed." In Benton v. Commissioner (C.A. 5), 197 Fed. (2d) 745, and Breece Veneer & Panel Co. v. Commissioner (C.A. 7), 232 Fed. (2d) 319, decisions of this Court were reversed. While in those cases the Courts of Appeals disagreed with our conclusions regarding the intention of the parties to the transactions, those Courts did recognize that the proper conclusion to be reached in any case is not dependent upon the form or nomenclature used, but rather is dependent upon the intent of the parties as evidenced by the contracts and the attending circumstances. [3]
*202 In the instant case the instrument in question executed on October 25, 1951, purports by its terms to be a lease for a 2-year term commencing January 1, 1952, and ending on December 31, 1953. It calls for the payment by the "lessee" to the "lessor" of four payments, designated "rental" amounting to $25,350 for the first year of the lease and $35,000 for the second year. Therein it is provided that the lessee is given the option to purchase the property on November 30, 1952, for a cash consideration of $98,867.90, and on November 25, 1953, for a cash consideration of $88,450.80, provided that prior to such respective dates the lessee had paid all required rentals. It is further provided that in the event of the exercise of the option the lessee should not be entitled to claim any refund of rental theretofore paid. The petitioner Alexander and Huston had discussions regarding a possible sale and purchase of the property. The petitioner asked a price of $225 per acre, or approximately $146,000, for the whole tract. Huston tried to get the petitioner to lower the price to $175 per acre, or approximately $113,500. Both Alexander and Huston testified at the trial. Alexander testified *203 that it was his desire to sell a half section, but that Huston wanted to buy the whole property; that Huston outlined a plan of purchase whereby certain payments would be paid as rent and the balance under an option to purchase, and under which interest would be paid on the unpaid balance throughout at 4 1/2 percent; that Huston offered $205 per acre with interest at 4 1/2 percent; that he, Alexander, countered with an offer of a round figure that would amount to about $210 per acre; that they then went to petitioner's lawyer's office and figured the interest on the unpaid balance; that there were no discussions as to how much Alexander would rent the property for; that the figures set forth in the contract as rentals were suggested by Huston; that the reason the November 25, 1953, option price ($88,450.80) was at a lesser figure than at November 30, 1952 ($98,867.90) was because at November 30, 1952, Alexander would not have received the final rental payment of $14,000 due to be paid on February 25, 1953; and that the total price he would receive would be the same whatever date the option was exercised, except that if Huston exercised the option on the earlier date there would be *204 less interest. Huston testified that he wanted to buy the entire tract because it adjoined the Benefield tract which he had just purchased; that Alexander wanted $200 per acre although he tried to get him down to $175; that because of other purchases he had made he was not financially able to buy the property outright; that he did not buy it outright on October 25, 1951, because he wanted to try out farming in that area and on the particular land after cleaning up the Johnson grass; that accordingly he insisted on a lease and option, as was his custom; that if he had good luck he wanted to apply the rental on the purchase price; that he did not tell Alexander, prior to the time the option was exercised, that he would exercise the option; that Alexander fixed the amounts set forth in the contract as rentals and that he agreed since he thought they were reasonable for vegetable land, it being his opinion that the rental value of good land was $50 to $60 per acre; that it is possible to make $2,800 or $3,000 per acre on vegetables; that he did not consider this transaction a sale on October 25, 1951, but, rather, as a rent deal; and that he did not know in 1951 whether he wanted to *205 purchase the land, since he was not sure he would make money in farming it. While the parties to the transaction differ in some respects in their testimony, we believe, on the basis of the whole record, that both contemplated that the rental payments should constitute payments on purchase price. There can be no question that the petitioners were attempting to sell the property. And Huston had just purchased the Benefield tract, adjoining the land in question and wanted to purchase the land and operate the two tracts together. The chief difference in the testimony of the parties to the transaction relates to their intention in drafting the agreement of October 25, 1951. According to Alexander's testimony the whole transaction was intended to be a sale, but that at Huston's insistence it was to be couched in terms of a lease and an option. Alexander described the manner of computing the figures appearing in the contract as "rental" and as "option price," based upon a price of about $210 per acre with interest. We are not satisfied from Huston's testimony that Alexander's version is incorrect. Huston professed to know very little about the manner in which the amounts were computed, *206 having left the computations to the petitioner and his auditors, but he did recall that there was some talk of a computation of interest. And apparently there was no dickering as to the rental value of the land as might be expected if the parties seriously contemplated that the option might not be exercised. This certainly is not the ordinary case of pure lease and option, since the option prices set forth differ widely, dependent upon whether the option would be exercised on November 30, 1952, or on November 25, 1953. It seems clear that the difference in the option price was affected by the "rental" payments made. This factor is strongly indicative that the parties intended the rental payments to be payments on the purchase price, resulting in an equity in Huston as a consequence of such payments. In addition we think it clear that the property had a value substantially in excess of the amounts set forth in the contract as the option prices. Both parties apparently recognized this as being so. Although Huston testified that in his opinion the land was worth about $88,000, the amount fixed as the option price on November 25, 1953, we note that this amounted to only $135 per acre, *207 whereas in his negotiations he apparently believed the land to be worth $175 per acre, or $113,750. Huston had also purchased other tracts in the same area for as much as $200 and $238.50 per acre, which is some indication of property values in the area even though they may have contained better improvements or had more acres under cultivation than the property in question. There was also testimony of an experienced real estate agent that the fair market value of the property was $225 per acre for the entire tract. This agent testified that there was a general decrease in land values through 1955 and 1956. For this reason we think it of no particular significance that Huston in 1956 sold this same property for about $90,000. The fact that in October 1951 the property had a value substantially in excess of the option prices set forth is persuasive that the parties intended the rental payments to be payments on the purchase price. When it is considered that by the second option date Huston would have paid $60,350 and that he could acquire title at that time by the payment of the additional amount of $88,450.80, we think it reasonable to conclude that from an economic standpoint Huston *208 would have anticipated completion of the deal in the absence of some unforeseen circumstance that would adversely affect the value of the land. Of some signifiance is the fact that in 1952 Houston, after entering upon the land, expended $8,000 to $9,000 in making substantial improvements of a permanent character, such as additions to the house, installing an additional irrigation well and pump, leveling ground, and building bridges. Also of some significance, we believe, is the fact that in the latter part of 1953, prior to the option date, Huston asked the petitioner to take the property back and asked for a refund of some or all of the payments he had made. [4]
*209 The fact that the petitioners first reported the 1951 payment in their tax returns for the year 1951 as rental, is not in our opinion decisive of the intent of the parties to the transaction. We construe Alexander's testimony as meaning that he was doubtful as to the legal consequences of the agreement itself, but that when satisfied by the advice of his auditors and otherwise, he filed amended returns within a year and treated the payment as proceeds from the sale of property. In cases of this nature one of the factors to be considered is the fair rental value of the property. The evidence in the record on this subject is contradictory. Huston's testimony that the fair rental value was $50 or $60 per acre would tend to support the view that the "rental" payments provided for in the agreement constituted reasonable rental. However, we have found it unnecessary to make a finding as to the fair rental value of the property, since even if the "rentals" were reasonable in amount, other factors are decisive that the payments were not intended as rent. Upon a consideration of the whole record, it is our conclusion that the "rental" payments here in question were not made merely for *210 the use of the property, but were made for the purpose of acquiring an equity in the property. Therefore, in the hands of the petitioners they constituted proceeds from the sale of the property. We have given careful consideration to Breece Veneer & Panel Co. v. Commissioner, supra, relied upon by the respondent. As has been indicated above, the decision in each case must turn upon the determination of the intent of the parties to the contract as evidenced by all the facts of record. The circumstances in the various cases differ widely. We have indicated above our conclusions as to the intention of the parties in the instant case. The facts in the Breece Veneer case substantially differ from those involved herein, and we accordingly do not consider that decision determinative here. The Court of Appeals there pointed out that although the RFC probably would not have sold the property for $50,000 in 1943, the time the contract was entered into, a large decline in the value could reasonably be expected in 1948, the option date, since the plant was not modern and the equipment was old. Thus, in that case one of the factors to be considered in determining the intent of the *211 parties strongly militated against the view that a sale was intended. In the instant case the evidence indicates that no such decline in value prior to the option dates could be anticipated, and we think the option prices fixed in the contract were clearly and substantially below the property value which might reasonably be expected at the option dates. In view of the foregoing, we conclude that the respondent erred in treating the payments in question as rental taxable as ordinary income to the petitioners. There is no issue raised as to whether, to any extent, the payments constituted interest. Other issues raised by the pleadings have been settled by the written stipulation filed at the hearing. Proper effect will be given to such stipulation in the recomputation under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Franklin Leon Alexander, Dkt. Nos. 57321, 61025; Helen McDonald Alexander, Dkt. Nos. 57322, 61026.↩
2. Section 23(a)(1)(A) of the Internal Revenue Code of 1939↩, allows as deductions rentals required to be paid for the use of property for business purposes, but only in connection with property "to which the taxpayer has not taken or is not taking title or in which he has no equity."
3. For a discussion of the various aspects of this complex problem see "The Tax Treatment of the Lease With an Option to Purchase," 32 Texas Law Review (1953-54), p. 839.↩
4. Huston testified on cross-examination in this respect as follows: Q. Why was it, if that's the case, Mr. Huston, that in the latter part of 1953 you went to Mr. Alexander and told him that you couldn't make the payments on the property and asked him whether he would buy it back? A. Because I had a deal in the Phoenix area and the Imperial Valley that year that lost me a lot of money, Phoenix, Arizona, Imperial Valley, El Centro. Q. Why did you ask him to buy it back? A. Because I didn't have the money to make the payments. Q. In other words, you thought you owned it and you wanted him to acquire it back from you? A. I wasn't able to make any payments that year. Q. Well, if this was a lease, Mr. Huston, what right did you have to ask for your payments back? A. He was going to take the ranch back,i asked him if he wanted to take the ranch back. Q. Didn't your contract provide that Mr. Alexander shall retain any rental payments? A. The contract provided, yes, two year rental deal, yes. Q. That's right. But you wanted him to pay back to you the $60,350.00 that you - A. I even offered to take less than that to get out from under the deal. Q. You wanted him to repay you that; is that right? A. I was trying to make a deal with him, yes.↩